**ANCHOR–DARLING INDUSTRIES, INC.**

v.

**Leonard SUOZZO**

**Civ. A. No. 79–4085.**

United States District Court,
E. D. Pennsylvania.

March 16, 1981.

John J. Barrett, Jr., Scott D. Patterson, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for plaintiff.

Donald L. Weinberg, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for defendant.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Presently before the court is defendant's motion for partial summary judgment pursuant to Fed.R.Civ.P. 56. The motion raises an important issue of federal securities law on which there is a divergence of opinion: Does the sale of an incorporated business by means of a transfer of the stock of the corporation fall within the purview of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder?

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Summary judgment is available only when there are no material fact issues in the litigation. *Adickes v. S. H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The court, for purposes of determining a summary judgment motion, must view the record in the light most favorable to the party opposing the motion. *Id.* With these principles in mind, the following are the undisputed material facts as developed from the pleadings, affidavits, and documents submitted to the court.

### I.

On November 16, 1977, the plaintiff, Anchor-Darling Industries, Inc. ("Anchor-Darling"), entered into an "Agreement To Purchase Stock" ("Agreement") by which Anchor-Darling purchased defendant Leonard Suozzo's ("Suozzo") controlling stock of three closely-held corporations, Bergen Pipe Support Corp. ("BPC"), Bergen Iron & Engineering Co. ("BIEG"), and International Nuclear Safeguards Corp. ("INC."). The Agreement was executed to effectuate the terms agreed to by Suozzo and representatives of Anchor-Darling in September of 1977 after extensive negotiations. During these negotiations, Anchor-Darling informed Suozzo that they sought to purchase his business in its entirety and that they would therefore also be purchasing the remaining equity interests in the three corporations held by Suozzo's two daughters and

several of his longtime employees to whom Suozzo had given shares.

The stock purchased from Suozzo consisted of the following shares:

| CLASS OF SHARES PURCHASED | NO. OF SHARES PURCHASED | NO. OF SHARES ISSUED AND OUTSTANDING |
|---|---|---|
| INC Common | 3,478 | 3,500 |
| BIEG Class "A" Common | 4,210 | 5,000 |
| BIEG Class "B" Common | 37,770 | 44,067 |
| BPC Common | 3,800 | 4,000 |
| BPC Class "A" Common | 17,550 | 25,316 |

Contemporaneously with its purchase from Suozzo, Anchor-Darling purchased the entire remaining equity interests in INC, BIEG and BPC from Suozzo's two daughters and longtime employees of the three companies. By its purchase of these shares in these three corporations, Anchor-Darling obtained complete domination and control over the assets and operations of these three corporations. At the time of the agreement, Suozzo was eighty-two years old and by the sale to Anchor-Darling had divested himself of any ownership and of all positions dealing with the business. Suozzo did, however, enter into consulting agreements with the three corporations.

Anchor-Darling brought this action against Suozzo, alleging that Suozzo made several knowingly false misrepresentations in the Agreement to Purchase Stock. Count I of the complaint alleges a violation of section 10(b)[1] of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5[2] promulgated thereunder by the Se-

---

1. Section 10(b) provides as follows:

   It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of the facility of any national securities exchange—

   . . . .

   (b) To use or employ, in connection with the purchase or sale of any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
   15 U.S.C. § 78j(b) (1977).

2. Rule 10b–5 provides the following:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instru-

mentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5 (1979).

curities Exchange Commission ("SEC"). The remaining counts of the complaint allege breach of warranty and common-law fraud.

Suozzo has moved for summary judgment on the Exchange Act claim of Count I. He contends that his transaction with Anchor-Darling was purely a commercial sale of an entire business and thus is not a transaction covered by the federal securities laws. For the reasons set forth below, I will grant the defendant's motion for partial summary judgment since the sale of Suozzo's business to Anchor-Darling is not within the purview of the Exchange Act.

## II.

■ In order for the plaintiff to prevail under section 10(b) or SEC Rule 10b–5, it must prove that its transaction with Suozzo involved a security, as defined by the Exchange Act. *Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir. 1973). "Security" is defined at section 3(a)(10) of the Act as follows:

> [W]hen used in this chapter, unless the context otherwise requires—
>
> . . . .
>
> (10) The term "security" means any note, stock, . . . certificate of interest or participation in any profit sharing agreement. . . , investment contract. . . , or in general, any instrument commonly known as a "security" . . . .

15 U.S.C. § 78c(a)(10) (1977).

■ The "Agreement to Purchase Stock" by its denomination as "stock" is, literally, covered by section 3(a)(10). The Supreme Court, however, has made it clear that not all sales transactions which involve "stock" are necessarily covered by the securities laws. In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), residents of a cooperative housing project, who had been required to purchase "stock" in the housing corpora-

tion in order to acquire co-op units, filed an action for fraud under the federal securities laws. The Supreme Court held that the shares of stock did not constitute "securities" within the meaning of those laws. The Court stated that the securities laws do not apply when the goal of a purchase of stock is not investment but is a desire to "use or consume the item purchased." *Id.* at 852–53, 95 S.Ct. at 2060–61. The Court reached this result after an examination of the Congressional purpose behind the enactment of the securities laws. The Court stated that the primary purpose of the securities acts

> was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded and the need for regulation to prevent fraud and to protect the interest of investors.

*Id.* at 849, 95 S.Ct. at 2059.

The *Forman* Court rejected at the outset any suggestion that because a transaction is evidenced by the sale of shares called 'stock', it "must be considered a security transaction simply because the statutory definition of a security includes the words 'any . . . stock'." *Id.* at 848, 95 S.Ct. at 2058. Instead the Court stated that an "economic reality" analysis should be applied to determine whether a particular transaction is within the scope of the federal securities laws. The three elements of this "economic reality" test that must be proven in order to establish the applicability of the securities acts are as follows: (1) an investment in a common venture; (2) premised on a reasonable expectation of profits; (3) to be derived from the entrepreneurial or managerial efforts of others. 421 U.S. at 852, 95 S.Ct. at 2060. *Accord, Frederiksen v. Poloway*, [Current] Fed.Sec. L.Rep. (CCH) ¶ 97,815, at 90,075 (7th Cir. 1981).

The first and third components of this analysis are absent from the instant case. The first element has not been established because Anchor-Darling made no investment in a common enterprise. To satisfy the requirement of a common venture, Anchor-Darling must demonstrate that there was a "sharing or pooling of funds." *Id.* (quoting *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 101 (7th Cir. (1977)). Since after its purchase of the stock of the three corporations, Anchor-Darling did not share the profits from these companies or pool funds with Suozzo, the first requirement of the economic reality analysis has not been satisfied. Plaintiff has also failed to establish the third element of the "economic reality" test, namely, that the profits be derived from the efforts of others. The record discloses that after the sale of the stock, Anchor-Darling was solely responsible for the continued management of BPC, BIEG and INC. Indeed, once Anchor-Darling purchased Suozzo's business, it terminated the operations of BPC and INC and the plaintiff resigned all functions and duties with all three corporations, including any positions as an officer or director of these companies. Since Anchor-Darling did not rely on anyone other than itself to bring about the profits from the companies it acquired from Suozzo, the purchase of the shares by Anchor-Darling was not a security transaction as contemplated by the federal securities laws.

Other courts have reached a similar result. In *Frederiksen v. Poloway*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 97,815 (7th Cir. 1981), the plaintiffs, Jefferey E. Frederiksen and Emerald City Corporation (ECC), purchased the assets and stock of North Shore Marina, Inc. (NSM) from defendant Edward Poloway. Plaintiffs entered into four agreements with defendant: an agreement to purchase assets; a stock purchase and voting trust agreement; an employment agreement between ECC and Poloway; and a management agreement between ECC and NSM. Subsequently, plaintiffs filed a complaint against Poloway, alleging that the interests they acquired in NSM were "securities" within the meaning of the federal securities acts and that, in connection with the sale of these interests, Poloway failed to disclose or misrepresented certain facts in violation of the 1933 and 1934 federal securities acts.

The Court of Appeals stated that the "critical legal issue" in the case was whether the plaintiffs' acquisition of North Shore Marina involved a "security" within the meaning of the federal securities acts. The court held that the transaction did not involve a "security" within the meaning of these acts. Judge Sprecher, writing for the court, applied *Forman's* "economic reality" test to reach this conclusion. He stated:

This case involves the scope of the federal securities laws. The question we confront is whether alleged fraud regarding the sale of assets and stock in a corporation falls within the scope of those laws. Not all sales transactions which involve "stock" are necessarily covered by the securities laws. *Rather, the test for coverage, in general, is whether the purchaser is placing money in the hands of another who will control the funds and the business decisions. If, however, the purchaser is assuming control of the critical decisions of the corporation, then the transaction is not considered to involve "securities."* Here, we find that the purchaser took control of the corporation. Therefore, this situation does not involve a "security" within the meaning of the federal securities laws.

*Id.* at 90,072 (emphasis added). Judge Sprecher further ruled that the federal securities laws do not apply when "the transaction is primarily for commercial (i. e., motivated by a desire to use, consume, occupy or develop)," rather than for "investment purposes." *Id.* at 90,073.

The Supreme Court of Georgia, applying federal securities laws, arrived at the same result in *Tech Resources, Inc. v. Estate of Hubbard*, 246 Ga. 583, 272 S.E.2d 314 (1980). In that case, the defendants were the owners of all of the shares of three corporations

engaged in the coal business. Pursuant to an Agreement to Purchase Stock, the defendants sold all of their shares of the three corporations to plaintiff, Tech Resources, Inc. After the sale, Tech Resources, Inc. was in exclusive control of the corporations and was solely responsible for their operations. The plaintiff sued the defendants for recission of the transaction on the ground that the conveyance of the shares of the corporation amounted to a security transaction in violation of the registration and anti-fraud provisions of the Georgia and federal securities laws. The Georgia Supreme Court was presented with one issue on appeal: Were the sales of the shares of the three corporations security transactions so as to cause them to be in violation of the state and federal securities laws? The court unanimously held that the sales of these shares were not within the purview of the federal or state securities laws. The court stated:

> In order for a transaction to constitute a securities transaction under the law, there must be an investment, a reasonable expectation of profits, and a reliance on the management of another party to bring about the profits. In the present case, there is undeniably an investment and a reasonable expectation of profits. The missing element is the reliance on anyone other than the purchaser for the performance of managerial duties in order to bring about the profits. For this reason, the sales of shares of the corporations were not a security transaction as contemplated by either the state or federal statutes.

*Id.* at 316–17.

In *Chandler v. Kew, Inc.* [1979 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 96,966 (10th Cir. 1977) (not elsewhere reported), the Tenth Circuit, relying on the Supreme Court's decision in *Forman*, held that the sale of a retail liquor business which included the transfer of ownership of the stock in that business was a purely commercial transaction that was outside the scope of the federal securities acts. The court stated:

The economic realities of the case at bar show that the plaintiff was buying a liquor store and, incidentally as an indicia of ownership, was receiving 100% of the stock of the company which owned the store. There was no security transaction within the purview of the federal statutes.

*Id.* at 96,054. *Accord, Dueker v. Turner* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,386 (N.D.Ga.1979); *Bula v. Mansfield* [1979 Transfer Binder], Fed.Sec. L.Rep. (CCH) ¶ 96,964 (D.Colo.1977).

### III.

In opposing defendant's motion for summary judgment, plaintiff argues that this court should follow *Coffin v. Polishing Machines, Inc.*, 596 F.2d 1202 (4th Cir.), *cert. denied*, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979); *Mifflin Energy Sources, Inc. v. Brooks*, 501 F.Supp. 334 (W.D.Pa. 1980); *Titsch Printing, Inc. v. Hastings*, 456 F.Supp. 445 (D.Colo.1978); *Bronstein v. Bronstein*, 407 F.Supp. 925 (E.D.Pa.1976), which hold that a sale of an incorporated business by means of a transfer of stock is within the ambit of the federal securities laws.

In *Coffin*, the president of Polishing Machines, Inc. contacted the plaintiff and encouraged him to purchase stock in his company. The president stated that his company was offering its stock in order to finance expansion. The parties reached an agreement in which the plaintiff purchased fifty percent of the outstanding stock of Polishing Machines and became its vice-president. The plaintiff thereafter discovered he had been defrauded in the transaction and sought recovery under the federal securities laws.

The Court of Appeals reversed the lower court's dismissal of the complaint for lack of subject-matter jurisdiction, holding that when "ordinary corporate stock" is involved in a transaction, it is covered by the securities laws. 596 F.2d at 1204. In analyzing the transaction the court stated:

> [T]he descriptive report supplied to Coffin during the negotiations indicates

that Polishing Machines wanted to sell stock in order to finance corporate expansion. Thus, the transaction appears to be the very sort of transfer with which the federal securities laws are most concerned, "the sale of securities to raise capital for profit-making purposes."

596 F.2d at 1204 (quoting *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975)).

In the present case, in contrast to the situation in *Coffin,* the transaction between Anchor-Darling and Suozzo did not involve a sale of corporate stock to raise capital for profit-making purposes. Instead, the plaintiff sought to acquire Suozzo's business in its entirety. The "stock" sale was merely a method used to vest Anchor-Darling with ownership of that business.

The results in *Mifflin Energy Sources, Titsch Printing* and *Bronstein* as well as *Coffin* were decided on the premise that the three pronged "economic reality" test of *Forman* is inapplicable when the stock of the acquired corporation has all the traditional attributes of stock. These courts hold that *Forman* requires a court to use the "economic reality" analysis only when the shares that have been purchased have "none of the characteristics 'that in our commercial world fall within the ordinary concept of a security'." *Mifflin Energy Sources, Inc. v. Brooks,* 501 F.Supp. 334, 335 (W.D.Pa.1980), (quoting *Forman,* 421 U.S. at 851, 95 S.Ct. at 2060). For example, in *Mifflin Energy Sources,* the court held:

The Defendants contend that the economic reality test of *United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), should be applied, with the result that the reality of the transaction here was only the sale of a business.

. . . .

Application of the economic reality test of *Forman* is not necessary here. The present contract is a stock purchase agreement and is so titled. The stock in the corporation has all the traditional attributes of stock, including the right to receive dividends, negotiability, voting rights, and the potential of appreciation in value. There is no evidence to show that what we are dealing with in this transaction is anything other than stock within the definition of the securities laws.

501 F.Supp. at 335–36.

Several courts have rejected this interpretation of the *Forman* decision and have applied the "economic reality" test to the purchase of a business by means of a transfer of stock. *Frederiksen v. Poloway* [Current] Fed.Sec.L.Rep. (CCH) ¶ 97,815 (7th Cir. 1981); *Dueker v. Turner* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 97,386 (N.D.Ga.1979); *Bula v. Mansfield* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,964 (D.Colo.1977); *Tech Resources, Inc. v. Estate of Hubbard,* 246 Ga. 583, 272 S.E.2d 314 (1980).

In *Frederiksen,* the Seventh Circuit criticized the Fourth Circuit's refusal to apply the "economic reality" test in *Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979). The *Frederiksen* court stated:

Moreover, we note, without deciding, that the *Coffin* court's statement of the method of analysis required by *Forman* may be overly broad. The *Coffin* court stated:

*Forman* requires us to analyze the substance of a transaction *only* when the stocks involved do not have the "significant characteristics typically associated with the named instrument."

596 F.2d at 1204, *quoting Forman,* 421 U.S. at 851, 95 S.Ct. at 2060 (emphasis added).

We are not persuaded that the cited passage supports the *Coffin* court's conclusion. Our reading of *Forman* is that an "economic reality" assessment might be required by *Forman* even if the stocks involved do have some characteristics typically associated with investment securities. As the *Forman* Court stated:

Because securities transactions are economic in character, Congress intended

the application of these statutes to turn on the *economic realities underlying a transaction, and not on the name appended thereto.*

421 U.S. at 849, 95 S.Ct. at 2059. *This language implies that the "economic reality" of a transaction is always a key issue.* [Current] Fed.Sec.L.Rep. (CCH) ¶ 97,815 at 90,075 n.2 (emphasis added).

One commentator also advocates that the "economic reality" test be applied to the acquisition of a business through the purchase of its stock:

> [L]abeling an instrument a security must be based upon an investor-oriented analysis of the economic realities underlying the transaction. The realistic approach, rather than a superficial determination of whether traditional characteristics are present, is the major lesson of the *Forman* decision.
>
> . . . .
>
> The *Forman* Court . . . did not hold that automatic inclusion results when traditional characteristics of stock are present. In fact, the literal approach was rejected by the *Forman* Court and the Court stressed economic realities both when it analyzed the stock for traditional characteristics and when it analyzed the stock under the investment contract formula. If the economic realities demonstrate that the investor is not relying on the significant managerial efforts of others, the stock should not be held to be a security for federal purposes.

Comment, *Acquisition of Businesses Through Purchase of Corporate Stock: An Argument For Exclusion From Federal Securities Regulation*, 8 Fla.St.U.L.Rev. 295, 301, 316 (1980) (footnotes omitted).

### IV.

I am persuaded that *Forman's* "economic reality" analysis should be applied to the instant case and that the reality of the transaction here was the sale of a business negotiated at arms length by knowledgeable persons. Defendant is therefore entitled to summary judgment on the federal securities claim.