The SEAGRAVE CORPORATION, formerly known as Seakoff Corp., Plaintiff,

v.

VISTA RESOURCES, INC., formerly known as The Seagrave Corporation, Eastern Vista Corp., formerly known as Armour Glass East Corp., Western Vista Corp., formerly known as Flour City Architectural Metals Corporation, Arnold A. Saltzman, Carl J. Simon and Herbert J. Kirshner, Defendants.

No. 81 Civ. 4990 (RWS).

United States District Court, S. D. New York.

Feb. 25, 1982.

Golenbock & Barell, New York City, for plaintiff; Michael C. Silberberg, Geri S. Krauss, New York City, of counsel.

Graubard, Miskovitz, McGoldrick, Dannett & Horowitz, New York City, for defendants Vista Resources, Inc., Eastern Vista Corp. and Western Vista Corp.; Jack Weinberg, Steven Mallis, New York City, of counsel.

Shea & Gould, New York City, for defendants Arnold A. Saltzman, Carl J. Simon and Herbert J. Kirshner.

## OPINION

SWEET, District Judge.

Plaintiff The Seagrave Corporation ("New Seagrave") filed suit seeking damages pursuant to the federal securities laws. Defendants Vista Resources, Inc., et al. ("Old Seagrave") move to dismiss the complaint under Rule 12(b)(6) Fed.R.Civ.P., on the grounds that the complaint fails to state a claim on which relief can be granted and that this court lacks subject matter jurisdiction. The question presented by this motion is whether either stocks or promissory note transferred as part of a sale and purchase of assets, qualify as a "security" within the meaning of federal securities laws. Securities Act of 1933, § 2(1), 15 U.S.C. § 77b(1); Securities Exchange Act of 1934, § 3(a)(10), 15 U.S.C. § 78c(a)(10). For the reasons set forth below, I conclude that neither is a security within the meaning of the statutes, and consequently, defendants' motion to dismiss is granted.

The following facts are alleged in the pleadings and affidavits and are not in dis-

pute. Old Seagrave, a publicly traded company with securities listed on the New York Stock Exchange sold a substantial portion of its assets and business to New Seagrave and transferred all the outstanding shares of stock of 29 of its subsidiary and sub-subsidiary corporations in exchange for $17,082,652 in cash and $3,000,000 in a promissory note secured by an irrevocable letter of credit. Additionally Old Seagrave retained $6,500,000 in cash, and New Seagrave assumed $29,000,000 in liabilities and agreed to compensate Old Seagrave for tax obligations.

New Seagrave is a closely held corporation, whose shares are owned by Burton I. Koffman ("Koffman"), his family, and a family-owned corporate affiliate. The Koffmans have invested in numerous public and private companies. Even when acquiring 100% of a company's stock, the Koffmans attest that, as a general rule, they do not participate in day to day management but rely on the existing management.

The purchase and sale of the present transaction resulted from a lengthy history of negotiations. In early 1978, Mr. Arnold A. Saltzman ("Saltzman"), on behalf of Old Seagrave, and Koffman began negotiations for the purchase of shares and control of Old Seagrave. Filings with the Securities and Exchange Commission ("SEC") of Form 10–K and Form 10–Q Reports were evaluated by Koffman. Old Seagrave's employment contracts with existing management provided the requested assurances that present personnel would continue to manage the corporation. When Saltzman and Koffman could not agree on the purchase price for the public stock in Old Seagrave, the parties reconstructed the transaction for the sale and purchase of Old Seagrave subsidiaries. Given the tax advantages of this plan, the parties were able to agree on a purchase price beneficial to both. Additionally at Koffman's choice, the business would continue to be run by existing management.

Although counsel for the Koffmans initially sought representation and warranties as to Old Seagrave's financial condition, Saltzman refused to provide the requested assurances. He argued that the renegotiated transaction did not entitle Koffman to disclosures greater than those available to a purchaser in a tender offer. Koffman ultimately directed his attorneys to accept the representations in Old Seagrave's 10–K and 10–Q Reports, without more. When Old Seagrave was unable to comply with the time limitations on SEC comments on its proxy statement relating to the transaction, Koffman exercised his right not to proceed with the closing.

Shortly thereafter, the Koffmans purchased shares of stock in Old Seagrave. On the Schedule 13D which was filed with the SEC, the Koffmans described themselves as "private investors." Saltzman inquired as to Koffman's intent and was informed that Koffman wanted no representation on the Board of Directors because the purchase of stock was for investment purposes. At that time, Koffman agreed to give Old Seagrave options to repurchase 200,000 of the shares. Shortly thereafter, Old Seagrave exercised these options.

In the fall of 1979, Saltzman and Koffman reentered negotiations concerning purchase of stock in Old Seagrave. As in the prior negotiations, they could not agree on a purchase price. Therefore, they again structured the transaction as a purchase of assets and stock of subsidiaries of Old Seagrave. Except for the exclusion of the leather business from the sale, the transaction was essentially the same as the previously negotiated one, including the provision for existing management to continue the business and the concomitant refusal to provide representations concerning the financial condition of the corporation other than material in the updated 10–K Reports filed with the SEC. After the shareholders of Old Seagrave had approved the transaction, the contract closed on September 30, 1980.

On June 2, 1981, Old Seagrave filed a complaint against New Seagrave in New York State Supreme Court, charging that New Seagrave failed to pay $1,628,298 owing under the purchase and sale agreement with respect to certain recorded tax obliga-

tions. On August 10, 1981, prior to filing this complaint in federal court, New Seagrave answered and counterclaimed in state court. The counterclaims allege the same facts that form the basis of the complaint here.

New Seagrave's complaint alleges among other things that the Old Seagrave 1979 10–K Report failed to disclose and misrepresented material information, that the 1980 10–Q Report was misleading, and that these fraudulent, false and misleading statements and omissions violated the federal securities laws. Old Seagrave asserts that the court has no jurisdiction since the stock transfer was merely an indicia of the transfer of ownership of the subsidiaries, and not a security transaction within the meaning of the federal securities laws, and the promissory note was a cash substitute and not within the statutory definition of a security.

> Section 2(1) of the 1933 Act provides:
> When used in this subchapter, *unless the context otherwise requires —*
> (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 15 U.S.C.A. § 77b (1971). (emphasis added)

Section 3(a)(10) of the 1934 Act is its equivalent. *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 556, n.7, 99 S.Ct. 790, 794 n.7, 58 L.Ed.2d 808 (1979).

Clearly both the stock and the note fall squarely within the definition by their terms. The issue turns on the effect of the underlined clause on a transaction in which stock is transferred in the course of a sale of a business.

■ The Supreme Court has rejected a literal approach to the application of the quoted section and has looked to the underlying transaction rather than labels placed upon the instruments involved. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 850–51, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). Additionally, the Supreme Court has announced the test to determine under what circumstances an instrument is a "security" in *Security & Exchange Comm'n v. W. J. Howey,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *See International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 561, 99 S.Ct. 790, 797, 58 L.Ed.2d 808 (1979); *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight,* 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967). Moreover, the court has determined that "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight,* 389 U.S. at 336, 88 S.Ct. at 553. Although the Court has had occasion to extend the coverage of the securities laws to instruments not labeled in such a fashion as to place them within the statutory definition, *Securities & Exchange Comm'n v. W. J. Howey,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), it has yet to exclude a security having traditional characteristics of instruments within the definition on the basis of the contextual clause.[1] However, this and other courts have done so.

---

1. Although the Court held that stocks, which did not have the characteristics of stocks, were not securities in *Forman,* 421 U.S. at 851, 95 S.Ct. at 2059, it has never decided whether orthodox securities transferred as part of a sale and purchase of assets are within the provisions of the federal securities laws.

Similarly, the Second Circuit has not been presented with this issue. However, in *Exchange Nat'l Bank v. Touche Ross & Co.,* 544

New Seagrave does not simply urge this court to adopt a literal interpretation. In addition it relies on language in *Forman*, which indicates that the name given an instrument may be relevant on "occasions when the use of the traditional names such as 'stocks' or 'bonds' will lead a purchaser justifiably to assume that the federal securities laws apply." 421 U.S. at 850–51, 95 S.Ct. at 2059. *Id.* New Seagrave contends that the history of negotiations which resulted in the agreement of purchase led it "justifiably to assume that the federal security laws apply." *Id.*

New Seagrave submits that its assumption was justified because the stock that was purchased possessed the characteristics of stock identified in *Forman*[2], thereby indicating that this court need not apply the *Howey* test to determine whether a security exists. Nonetheless, New Seagrave has failed to convince this court to retreat from the position taken in *Reprosystem B.V. v. SCM Corp.*, 522 F.Supp. 1257 [Current] Fed. Sec.L.Rep. (CCH) ¶ 98,207 (S.D.N.Y., 1981).

Although the stocks which were transferred in *Reprosystem* had the common characteristics of stock, this court applied the economic reality test and determined that the securities law did not apply in the sale of a business because the transaction did not involve investment of money in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *Id.* at 1273–1274, Fed.Sec.L.Rep. at 91,450.

In *Golden v. Garafalo*, 521 F.Supp. 350 [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,277 (S.D.N.Y.1981), a similar result obtained. The Honorable William C. Conner rejected the argument that the presence of common features of stock enumerated in *Forman*

would waive an application of the economic reality test. *Id.* 522 F.Supp. 1257, Fed.Sec. L.Rep. at 91,773. The court indicated that the justifiable assumption exception of *Forman* must be read in the context of protecting unsophisticated purchasers and not in the context where, as here, "plaintiffs were represented throughout by able counsel, and negotiated and executed the agreement after the court's decision in *Forman*."[3] *Id.* I agree. *See Canfield v. Rapp & Son, Inc.*, 654 F.2d 459 (7th Cir. 1981); *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir.), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *Chandler v. Kew*, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,966 (10th Cir. 1977); *Anchor-Darling Industries v. Suozzo*, 510 F.Supp. 659 [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,933 (E.D.Pa.1981).

However, in *Mifflin Energy Sources, Inc. v. Brooks*, 501 F.Supp. 334 (W.D.Pa.1980), and in *Titsch Printing, Inc. v. Hastings*, 456 F.Supp. 445 (D.Col.1978), the courts concluded otherwise. In *Mifflin Energy Sources*, the court found the "stock purchase agreement" of the underlying transaction language persuasive. Similarly, the court in *Titsch Printing* construed the *Forman* decision to mean that the economic reality test should be applied only when stock lacks the common elements of a security in order to determine whether the investment possessed the characteristics of an investment contract; an investment of money in a common enterprise with profits to come solely from the efforts of others. The court concluded that in addition to relying on the balance sheet of a corporation, the purchaser of one percent or one hundred percent of shares of stock has the "reasonable expectation that he is a benefi-

---

F.2d 1126 (2d Cir. 1976), the court examined the context of the transaction in addition to the form and label of the instrument before concluding that notes purchased from a brokerage house in reliance on the accounting firm's opinion regarding the financial condition of the issuer were securities. Thus courts which examine the context of the transaction at issue, as discussed *infra*, are consistent with *Exchange Bank*.

2. Attributes of corporate stock include dividend rights, voting rights, apportionment of profits and alienability.

3. Additionally, defendants point to the fact that after requesting greater assurances, Koffman directed his attorneys to accept the limited representations.

ciary of protection afforded by the federal securities laws." *Id.* at 449. New Seagrave makes an even stronger argument here based on the negotiations outlined above.

However, for the following reasons, I remain unpersuaded by New Seagrave's argument and its adoption of *Mifflin Energy Resource* and *Titch Printing.* In attempting to distinguish the instant case from *Reprosystem* and *Garafolo,* New Seagrave characterized the transfer as a "friendly tender offer" to establish the transaction as a security within the meaning of the federal statute. Plaintiff's Memorandum of Law, at 23. However, this transaction does not possess the particular characteristics of a tender offer[4] and the self-served description of New Seagrave has failed to fashion an effective jurisdictional bootstrap.

■ New Seagrave placed greater reliance on the references during negotiations to the representations and warranties in the 10–K and 10–Q Reports filed with the SEC. New Seagrave points rather persuasively to this history and the condition of shareholder approval solicited by a proxy statement subject to the federal securities laws and to Saltzman's refusal to give any representations that would not be given in the public disclosure of the 12–K and 10–Q all as indications that both parties intended the protection of the federal security laws to apply to the transaction. However, the expectations, subjective intentions and motivations of parties do not determine whether the federal securities laws apply, *Security & Exchange Commission v. Aqua-Sonic Products Corp.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,256, at 91,677–78 (S.D.N.Y. Aug. 7, 1981) or whether this court has jurisdiction. *See American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 17–18, 71 S.Ct. 534, 541, 95 L.Ed. 702 (1951).

■ Additionally, New Seagrave's assertion that it made a passive investment dependent on the management of the seller does not comport with reality. What is

critical to this court's determination is whether an investor is " 'attracted solely by the prospects of a return' on his investment" or "whether a purchaser is motivated by a desire to use or consume the item purchased." *Forman,* 421 U.S. at 852–53, 95 S.Ct. at 2060 (quoting *Howey,* 328 U.S. at 300, 66 S.Ct. at 1103). Once again I conclude the authority of *Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), most helpful. The Seventh Circuit held that an acquisition of a marina did not involve a security within the meaning of federal statutes. Since the buyers desired to acquire the business in its entirety, the court determined that this " 'stock' sale was a method used to vest ECC with ownership of that business. There was no offer of investment 'securities'. The stock ... merely was passed incidently as an indicia of ownership of the business assets." *Id.* at 1151–52. Central to the court's conclusion that requirements of the "economic reality" test were not met, was the determination "whether the transaction is primarily for commercial (i.e., motivated by a desire to use, consume, occupy or develop), or for investment purposes." *Id.* at 1150; *see Barsy v. Verin,* 508 F.Supp. 952, 957 (N.D.Ill.1981). New Seagrave seeks to avert the thrust of *Frederiksen* and *Barsy* by a claim that it is not involved in day-to-day management of the business acquired and has relied on the existing management and corporate structure.

Nonetheless, whatever choice it exercised, New Seagrave owned the business and totally controlled its resources and management. Koffman was chairman of the board and president of New Seagrave, empowered with all rights, powers and duties of these positions. Although Koffman chose to rely on existing officers for day to day management decisions, he had the power to hire or fire these officers as indicated by its promotion of David Hazelmeyer as plant mana-

---

**4.** Characteristics of a tender offer include a public bid to all shareholders to buy shares of a company, a tender of stock for purchase, usually at a premium price, and an obligation to purchase all or a portion of tendered shares within a limited period of time, if certain conditions are met. *Kennecott Copper Corp. v. Curtiss-Wright,* 584 F.2d 1195 (2d Cir. 1978).

ger. Moreover, after the closing of the agreement of sale and purchase, Old Seagrave has not been involved with management, control, profits or investments of the business.

■ Furthermore the transaction at issue fails to qualify as a common venture. Whether a common venture exists has been the subject of much litigation, particularly in the area of futures trading accounts. Fortunately, this court need not enter the mysteries created by such litigation, although these decisions are instructive in developing varying litmus tests to determine what comprises a common enterprise.

The Seventh Circuit requires a "sharing or pooling of funds" in order to conclude that a common venture is satisfied. *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 101 (7th Cir. 1977). On the other hand the Fifth Circuit rejected this requirement and determined that "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [investment manager's efforts]." *Securities & Exchange Commission v. Continental Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974). Whether the Seventh Circuit's horizontal commonality test is applied or whether the Fifth Circuit vertical commonality is adopted the result in this case is unchanged. Both tests require multiple investors. As Honorable Robert J. Ward recently noted, "the common enterprise component of the *Howey* test states merely that the financial relationship . . . must include two or more parties whose profits or losses are interdependent to a certain extent." *Savino v. E. F. Hutton & Co.*, 507 F.Supp. 1225, 1238 (S.D.N.Y.1981).

Here the Koffmans were the only investors. Old Seagrave divested itself of 29 subsidiaries and transferred 100% of the stock in these subsidiaries to the Koffmans. Although the Koffmans may have intended the purchase of the assets of Old Seagrave to be a passive investment and although they may have relied on the executive officers who had managed and continued to manage the day to day operation of the businesses, the Koffmans alone had a financial investment in New Seagrave. Hence there is no common venture.

I conclude that the transaction which involved a sale of a business in which stocks were transferred as an indicia of ownership is not a context in which the securities laws apply.

■ The same economic reality test thus applied to the shares of stock will be applied as well as to the promissory note, despite the language in *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir. 1976), which advocated greater reliance on statutory language than on such a test. *Id.* at 1137. The Second Circuit found in the context of *Exchange Bank* that the statutory language applied. However, as noted by the Honorable John M. Cannella, the terms and form of the notes in *Exchange Bank* were remarkably different than notes occurring in the "mercantile" setting which are cash substitutes. *Altman v. Knight*, 431 F.Supp. 309, 312 (S.D.N.Y.1977). The Honorable Henry J. Friendly also suggested that notes similar to those "delivered in consumer financing, . . . secured by a mortgage, . . . secured by a lien, . . . evidencing a 'character' loan to a bank customer, . . . secured by an assignment of accounts receivable, or . . . which simply formalizes an open-account debt" would not constitute a security. *Exchange Bank*, 544 F.2d at 1137–38.

The note in the instant case is a purchase money note secured by an irrevocable stand-by letter of credit. As such it does not resemble the *Exchange Bank* note but rather is similar to the notes in *Altman* and the exceptions listed by Judge Friendly. *See Emisco Industries Inc. v. Pro's Inc.*, 543 F.2d 38 (7th Cir. 1976). Therefore I conclude that the note delivered to Vista is not a security within the meaning of the federal statutes.

■ Having determined that the federal securities laws do not apply, this court lacks

subject matters jurisdiction. Consequently, Vista's motion to dismiss is granted.[5]

Settle judgment on notice within ten (10) days.

IT IS SO ORDERED.

---

5. Eminent counsel for the Old Seagrave defendants has urged the court to award costs upon the granting of this motion as a court administered therapy to cure plaintiffs from seeking to assert securities act jurisdiction to avoid state court determinations. Although I have not adopted New Seagrave's view of this court's jurisdiction, the area is not so clearly defined as to cause this action to be considered baseless and vexatious, and consequently I decline to award the costs of the instant motion.