Andrew COLSON and Huston Lumber & Supply Co., Inc., Plaintiffs,

v.

Lyle E. BERTSCH, Defendant.

Lyle E. BERTSCH, Counterclaim Plaintiff,

v.

Andrew COLSON, Counterclaim Defendant,

and

Major Pool Equipment Corp., et al., Additional Defendants on Counterclaims.

Civ. A. No. 82–3640.

United States District Court, D. New Jersey.

May 8, 1984.

As Amended May 9, 1984.

Hehl, Romankow, Taub & Wilde, Stephen F. Hehl, Union, N.J., for plaintiffs.

Shea & Gould, Martin Samson, New York City, Pitney, Hardin, Kipp & Szuch, Frederick L. Whitmer, Morristown, N.J., for defendant, counterclaim plaintiff.

Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor, Marion Percell, Roseland, N.J., for counterclaim-defendants Magid, Ketover, Cohen, Swett, Spitz, Maggion and Semiraro.

Pollner, Mezan & Stolzberg, William M. Pinzler, New York City, for additional defendant on counterclaim Mendolsohn Karey Bell & Natoli.

## OPINION

SAROKIN, District Judge.

This case again presents for the court's consideration the extremely difficult legal problem of defining the term "security" for purposes of the securities acts. In deciding this issue the court must attempt to ascertain the intention of Congress, although the world which Congress saw when it drafted these Acts is far different from the world today. The use of the corporate entity in the business world has become commonplace for a variety of reasons, including taxes, insulation from personal liability, etc. Sales of stock can be utilized as a vehicle for the sale of land, small businesses and for the acquisition of control and management of ongoing concerns. Although traditional stock may be utilized, to place every such sale within the ambit of the statute would far exceed the reach of the statute contemplated by Congress.

■ Just as it is inconceivable that the statute was intended to cover the sale of 100% of the stock in a privately held corporation owning only a vacant lot or a corner grocery store, so was the statute not meant to control every sale of property, assets or controlling interests in ongoing companies.

The mere fact that such sales are through the vehicle of stock does not automatically render the act applicable.

■ The Securities Acts were meant to protect the passive investor, one who would not ordinarily take the same precautions as one purchasing for purposes of control and management. The latter would normally be expected to investigate and evaluate and not to rely solely upon the representations of the seller without accounting and/or legal advice. The average investor, on the other hand, usually relies upon the representations of the seller and takes no independent action to investigate, evaluate or protect against the failure of the true facts to comport with the representations so made. It is this latter class of purchasers and that class alone which the statute intends to protect.

■ Such an approach requires courts to place investors into one of these two classes. In undertaking such an analysis, in cases such as these, a court should consider factors such as the following:

1) whether the purchaser intended to acquire control and to exercise it;

2) whether the purchaser actually exercised or had the power to exercise such control and management after acquisition;

3) whether the purchases were made through negotiations as opposed to solely on the open market;

4) whether the purchaser utilized or had the opportunity to utilize legal and/or accounting services in seeking to acquire control;

5) whether the purchaser had direct dealings with management or the owners.

With these factors in mind, the court here confronts a close case. In this instance, the problem arises as the result of shares of stock in Major Pool Equipment Corp. ("Major") sold to defendant Bertsch by plaintiff Colson and by Major itself, which stock comprised between 35% and 49% of the corporation's outstanding shares. Bertsch claims that Colson, Major, individual directors of Major and Major's

accountant ("the counterclaim defendants") violated the securities laws and otherwise defrauded Bertsch by falsely inflating the fiscal health of Major in financial reports made available to Bertsch, and in oral and written statements made by the counterclaim defendants which allegedly induced Bertsch to rely upon those reports. Bertsch therefore brings this action[1] against the aforementioned parties for violations of sections 10(b), 13(a), 18 and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j, 78m, 78r, 78t, sections 12(2), 15 and 17 of the Securities Act of 1933, 15 U.S.C. §§ 77*l*, 77*o*, 77q, and New Jersey statutory and common law.

The counterclaim defendants here move for summary judgment on Bertsch's claims arising under the federal security laws, arguing that Bertsch was not an investor but a purchaser of control. In support of their motion, they point to Bertsch's own deposition testimony to the effect that his intention in purchasing stock was to take control of Major. They also contend that upon purchasing such stock, pursuant to two Stock Purchase Agreements and one Voting Trust Agreement, Bertsch did gain a controlling share of Major; that Bertsch exercised his control by appointing himself Chairman of the Board of Major and installing a majority of the directors on the Board; and that he took over the day-to-day management of Major by installing new officers, including his son, Robin Bertsch, as President of the Corporation. Bertsch does not controvert most of these facts; he does, however, argue that deposition testimony reveals that he did not manage the day-to-day operations of Major. He also contends that, as the securities he purchased constituted the stock of a publicly-traded corporation, such securities ought to be governed by the federal securities laws, as he assumed they would be in structuring the transaction as he did.

DISCUSSION

A. *The economic reality test.*

In its earlier opinions in the case of *Ruefenacht v. O'Halloran,* Civil Action No. 80–4097 (D.N.J. April 21, 1982, April 15, 1983), this court adopted an "economic reality test" to determine whether transactions involved securities within the meaning of the federal securities laws. In so doing, the court selected one of two valid theories reflected in numerous decisions construing these laws. The statutes are, to be sure, less than clear as to the definition of a security. Thus, the Securities Exchange Act of 1934 defines a security, "unless the context otherwise requires," as

> any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10).[2] Nor has the Supreme Court definitively ruled on this ques-

---

**1.** Initially, Colson brought this action against Bertsch seeking damages for Bertsch's breach of an agreement whereby he, Bertsch, would purchase 100,000 shares of Major's stock from Colson, as well as 77,413 such shares which had been placed in a voting trust. When Major came upon the financial hard times it is now experiencing—it is in bankruptcy—Bertsch refused to buy the latter 77,413 shares. It is also alleged that Bertsch breached an agreement

whereby he would appoint plaintiff Huston Lumber & Supply Co., Inc. to be exclusive distributor for Major, as well as for Fort Wayne Pools, Inc., another manufacturer of swimming pools of which Bertsch was a principal.

**2.** The definition of a security for purposes of the Securities Act of 1933, *see* 15 U.S.C. § 77b(1), is essentially the same, and has always been treated as such by the courts. *See Marine Bank v.*

tion: in *Forman, supra,* the Court held that the fact that something is labelled "stock" does not automatically bring it within the scope of the federal securities laws: "Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto." 421 U.S. at 849, 95 S.Ct. at 2059. *See also Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Thus, the Supreme Court promulgated a list of those "characteristics traditionally associated with stock." [3] Each of these is undoubtedly and uncontrovertedly characteristic of the stock involved here. However, the Court stated, while discussing investment contracts, also in the definition of security cited *supra,*

> We perceive no distinction ... between an "investment contract" and an "instrument commonly known as a 'security.' " In either case the basic test for distinguishing the transaction from other commercial dealings is
>
>> "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." [*S.E.C. v. W.J.*

Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) ].

The test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepeneurial or managerial efforts of others. 421 U.S. at 852, 95 S.Ct. at 2060 (footnote omitted). As in the *Howey* case cited by the Court, this language, despite its sweeping nature, appeared in the context of a discussion of investment contracts.[4] Since *Forman,* the Courts of Appeals have split as to the case's meaning: four circuits have held that the language cited above refers only to investment contracts, and a stock should always be deemed a security, irrespective of its quantity or the intent of the purchaser to manage or control, if it possesses those qualities normally attributable to stock. *Golden v. Garafalo,* 678 F.2d 1139 (2d Cir.1982); *Seagrave Corp. v. Vista Resources, Inc.,* 696 F.2d 227 (2d Cir.1982); *Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979); *Daily v. Morgan,* 701 F.2d 496 (5th

*Weaver,* 455 U.S. 551, 555 n. 3, 102 S.Ct. 1220, 1223 n. 3, 71 L.Ed.2d 409 (1982), citing *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

3. The Court labelled the right to receive dividends contingent upon an apportionment of profits the most common feature of stock. The "other characteristics traditionally associated with stock" were said to be absent in *Forman* because the shares there at issue

> ... are not negotiable; they cannot be pledged or hypothecated; they confer no voting rights in proportion to the number of shares owned; and they cannot appreciate in value.

421 U.S. at 851, 95 S.Ct. at 2060.

4. Nor did the Supreme Court effectively clarify *Forman* with its decision in *Weaver v. Marine Bank, supra.* In *Weaver,* the Court reversed the Third Circuit, holding that neither a certificate of deposit nor a guarantee agreement constituted securities under the facts of that case. Those courts favoring an economic realities test point to *Weaver*'s emphasis on limiting the scope of

the securities laws, 455 U.S. at 555–56, 102 S.Ct. at 1223, as well as to the Court's having looked beyond the language of the statute, in order to vindicate Congress' purpose in protecting passive investors, and not entrepreneurs. *See, e.g., Sutter v. Groen,* 687 F.2d 197, 200–01 (7th Cir. 1982). Those courts favoring a "qualities normally attributable to stock" test point out that the *Weaver* Court continued to define stock, in particular, according to its own attributes. *See* 455 U.S. at 559, 102 S.Ct. at 1225, cited in *Golden v. Garafalo,* 678 F.2d 1139, 1143 (2d Cir.1982). The Supreme Court's parting words were, the court believes, revealing:

> It does not follow that a certificate of deposit or business agreement between transacting parties invariably falls outside the definition of "security" as defined by federal statutes. Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.

455 U.S. at 560 n. 11, 102 S.Ct. at 1225 n. 11. The Court's qualification of its holding rings of the economic reality doctrine extended beyond the investment contract, in particular by virtue of its focus on intent.

Cir.1983); *Cole v. PPG Industries, Inc.*, 680 F.2d 549, 555–56 (8th Cir.1982). Four other circuits have viewed *Forman's* language as mandating that the courts look to the economic realities in determining whether stocks, as well as investment contracts, are to be considered "securities": if what is actually involved is a sale of a business, these circuits hold that such sale is not a transaction involving securities, even if accomplished by the sale of what is nominally stock. *Sutter v. Groen*, 687 F.2d 197 (7th Cir.1982); *Canfield v. Rapp & Son, Inc.*, 654 F.2d 459 (7th Cir.1981); *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir.), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *Landreth Timber Co. v. Landreth*, 731 F.2d 1348 [Current Volume] Fed.Sec.L.Rep. (CCH) ¶ 99,705 (9th Cir. March 7, 1984); *Chandler v. Kew*, 691 F.2d 443 (10th Cir. 1977); *King v. Winkler*, 673 F.2d 342 (11th Cir.1982). The Third Circuit has not ruled on this issue,[5] and the district courts within this circuit are themselves split. *Compare, e.g., Goodman v. DeAzoulay*, 554 F.Supp. 1029, 1032–35 (E.D.Pa.1983) (adopting economic reality test); *Anchor-Darling Industries, Inc. v. Suozzo*, 510 F.Supp. 659 (E.D.Pa.1981) (same) *and Cole v. Ford Motor Co.*, 566 F.Supp. 558, 564–65 (W.D.Pa. 1983) (adopting qualities normally attributable to stock test); *Mifflin Energy Sources, Inc. v. Brooks*, 501 F.Supp. 334, 335–36 (W.D.Pa.1980) (same), citing *Bronstein v. Bronstein*, 407 F.Supp. 925 (E.D. Pa.1976). Moreover, scholarly opinion on the subject is passionately divided, *compare, e.g.*, Thompson, *The Shrinking Definition of a Security: Why Purchasing All of a Company's Stock is Not a Federal Security Transaction*, 57 N.Y.U.L.Rev. 225 (1982) *and* Comment, *A Criticism of the Sale of Business Doctrine*, 71 Calif.L. Rev. 974 (1983), though the weight of opinion seems to favor the doctrine, in some form. *See, e.g.*, Easley, *Recent Developments in the Sale-of-Business Doctrine: Toward a Transactional, Context-Based Analysis for Federal Securities Jurisdiction*, 39 Bus.Law. 929 (1984).

■ There is, however, unanimity within this district: this court's decision in *Ruefenacht, supra*, was in accord with that of Judge Debevoise in *Somogyi v. Butler*, 518 F.Supp. 970, 983–85 (D.N.J.1981). The court finds no reason to upset that minimal consensus by overruling itself here. The economic reality test, the court believes, best vindicates the congressional purpose behind the securities laws: to protect *investors*. Entreprenurial activity was not meant to be covered, and the entrepreneur remains unprotected by the Acts. *See, e.g., Sutter v. Groen, supra*, 687 F.2d at 201 (citing legislative history). Furthermore, the court sees no reason to apply an economic reality test to one term defined in the securities laws, but not another, mentioned in the same paragraph. Hence, the court does not hesitate to extend the test which even Bertsch concedes has been applied to investment contracts in *Howey*, *Forman* and *Weaver* to stocks. Indeed, a contrary result would be highly anomalous.

The court is, of course, cognizant of the arguments raised by Bertsch in opposition to the utilization of an economic reality test; they are the same arguments utilized by various of the courts of appeals. That investors' expectations may be dashed by having stock held not to fall within the protection of the securities acts begs the question of the meaning of the Acts; investors ought not believe they will be protected when they structure transactions in order to avail themselves of protections not due them. Nor ought such expectations reasonably persist in light of the courts'

---

**5.** The Third Circuit has not, however, been totally silent on the issue. In *Goodwin v. Elkins & Co.*, 730 F.2d 99, 102–103 (3d Cir.1984), the court looked to the realities of an economic arrangement in holding that a partnership agreement was not a security. *See also Id.* at 28 (Seitz, C.J., concurring), citing *Lino v. City Investing Co.*, 487 F.2d 689, 693 (3d Cir.1973) (franchise agreement not a security). And in *Glick v. Campagna*, 613 F.2d 31, 35 (3d Cir. 1979), the court examined the reality of the situation, concluding however that what was sold was securities and not merely the sale of a partnership interest. This conclusion, although it varied from that reached in *Ruefenacht, supra*, employed the same analysis.

rulings on this question: buyers, be they entrepreneurs or investors, are now on notice that at least in some circuits, they will be seen for what they are. Bertsch's argument regarding investors' expectations is therefore tautological. His argument that the securities laws were meant to protect against fraud of all kinds is similarly flawed. That the result of the employment of an economic reality test requires courts to undertake difficult line drawing, Bertsch's third argument, cannot be gainsaid. Such, however, is the function of the judge: courts draw difficult to ascertain lines every day where to do so is in the interests of justice or, as here, congressional purpose. The lines to be drawn here are no more difficult to administer than those confronted in the other areas of the law. For example, determining what constitutes "interrogation" for the purposes of the fifth amendment, *see, e.g., Rhode Island v. Innis,* 446 U.S. 291, 298–304, 100 S.Ct. 1682, 1688–91, 64 L.Ed.2d 297 (1980), or what constitutes a "policy or custom" for the purposes of defining a municipality's liability under 42 U.S.C. § 1983. *See Monell v. New York Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Courts make these types of determinations repeatedly. They will be able to do so in this context as well.

The court therefore remains committed to utilizing an economic reality test in determining whether transactions involving stock involve "securities" as defined by federal law.

**6.** The parties disagree on this number. The counterclaim defendants state that Bertsch acquired 43.5% of Major's stock, and would ultimately have controlled 49% thereof, while Bertsch states that he controlled only 35% of such stock. The disparity apparently results from the fact that Bertsch's calculation is based on total shares, while the counterclaim defendants' is based upon voting shares only. Resolution of this dispute is, in any event, unnecessary, as it is undisputed that Bertsch's acquisition was of a controlling share.

**7.** The court does not here address the issue of what bearing, if any, the fact of one failing to

*B. Application of the economic reality test.*

It remains only to apply the economic reality test to the facts of the instant case. Bertsch argues that, for three reasons, such application demonstrates that he was merely purchasing stock and not an entire business. These arguments are discussed below, *seriatim.*

■ First, Bertsch contends that, because he purchased only 35% of the stock of Major,[6] he cannot have been purchasing the entire business in order to acquire control thereof. This argument is without merit: where, as here, Bertsch himself stated that his goal in purchasing stock was not investment, but control, it matters not that he only acquired 35% of the shares of such corporation. *See Goodman v. DeAzoulay, supra,* 554 F.Supp. 1029, 1035 (one-third interest may comprise control where purchaser "did not expect profit predominantly from the entrepreneurial or management efforts of others but her profit was to be derived from a joint venture in which she herself was an active participant who had more than nominal duties"). That such shares did, in fact, result in Bertsch's acquisition of control comprises persuasive evidence that such acquisition was the goal of his purchase.[7]

Second, Bertsch argues that, because the stock here at issue was shares of a publicly held company, it must be protected by the securities laws and, indeed, Bertsch expected that it would be. It is true that, as Bertsch argues, no reported cases explicitly hold that the stock of a publicly held com-

acquire control though he or she intended to acquire it, would have on the application of the economic reality test. However, it believes that the determination of the purchaser's intent should be judged as of the date of sale. Subsequent conduct is not dispositive but may be considered relevant as to such intent. It may well be that a purchaser had no intent to actively manage at the time of purchase and did so only because of evolving circumstances. Such subsequent conduct should not be considered in determining the purchaser's intent at the time of sale.

pany does not qualify as a security. Nor does any case specifically find a stock to be a security for this reason alone. *See Golden v. Garafalo, supra,* 687 F.2d at 1142 (the sale of a business doctrine "has not been limited to closely held corporations") (dictum) (citing cases). In any event, such analysis is not necessary here: though the stock of Major was publicly held, it was not publicly purchased by Bertsch. That is, Bertsch did not buy the shares he purchased on the open market where, arguably, he would be entitled to the protection of the securities laws. Rather, he purchased all of his shares by virtue of private contracts of sale: 317,580 shares, previously authorized but unissued, were sold by Major to Bertsch and 177,413 shares by Colson, a former director of Major, to Bertsch. In substance, this was the private sale of Major to Bertsch—not little by little through a stock exchange, or over the counter, but in the form of contracts for the sale of an entire business. The shares of stock were mere indicia of ownership. *See Chandler v. Kew, supra,* 691 F.2d at 444.

Third, Bertsch contends that he was not in actual day-to-day control of Major. He points to deposition testimony to the effect that his son, Robin Bertsch, was President, and actually in charge of managing the business affairs of the corporation. The counterclaim defendants state that, in fact, Bertsch ran Major through his son. Hence, a dispute of fact exists as to this point, which is not resolved by the deposition testimony. The court, however, finds its resolution unnecessary. Acting as an entrepreneur, Bertsch acquired a controlling interest in Major.

> Armed with this controlling interest, [he] had the right to exercise complete control over the day to day activities of the business. Whether he chose to delegate the

dealership's management to one or more employees or operate the business himself, the profitability of the business depended on his own entrepreneurial efforts and ability, and not that of others.

*Somogyi v. Butler, supra,* 518 F.Supp. at 984. Therefore, the court finds that Bertsch controlled Major. That his delegation of control was to his own son strengthens this conclusion.

■ Application of the economic reality test therefore demonstrates that Bertsch intended to, and did in fact, acquire control of the business. Such purchase, though structured in terms of "stock" does not fall within the scope of the much interpreted federal securities laws. The court recognizes that it here confronts a difficult issue about which reasonable minds can, and have, differed. It awaits guidance from the higher courts [8] or, preferably from Congress, which ought to amend these laws to address the economic transactions of this day, rather than those of the 1930's. Until it does, courts such as this one will struggle to vindicate its purposes. That courts now see them differently underscores the need for action.

What is required in this area is not more judicial pronouncement but rather legislative clarification. The economic reality test requires a case by case analysis and therefore a tremendous expenditure of litigant's time and money on a threshold issue. Definitive congressional action would be of substantial assistance to both litigants and the court and would obviate this recurring waste of time and money.

The motion of the counterclaim defendants for summary judgment is therefore granted, and Bertsch's claims based upon the securities laws are dismissed.[9] An appropriate order will issue.

---

8. The court notes with satisfaction that the United States has submitted a brief as *amicus curiae* urging the Supreme Court to grant *certiorari* in *Seagrave Corp., supra.* Although, for the reasons set forth herein, the court disagrees with the position taken by the Solicitor General, it welcomes the ultimate resolution of this question.

9. The court, therefore, need not reach the counterclaim defendants' motions to dismiss certain counts because there do not exist private rights of action under section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m, or section 17 of the Securities Act of 1933, 15 U.S.C. § 77q.