Fred ZILKER, etc., Plaintiff,

v.

Sam W. KLEIN et al., Defendants.

No. 77C1672.

United States District Court,
N. D. Illinois, E. D.

April 6, 1981.

John C. Tucker, Joan M. Hall, Christopher J. McElroy, Ronald L. Marmer, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiff Fred Zilker ("Zilker"), a shareholder of Bally Manufacturing Corporation ("Bally"), brings this derivative action against current and former directors of Bally and, of course, against Bally itself. Zilker's six-count Complaint charges the individual defendants ("Defendants") with violations of the Securities Exchange Act of 1934 (the "1934 Act") and, under pendent jurisdiction principles, with breaches of fiduciary duties under state law. Defendants have moved for summary judgment on all counts of the Complaint. For the reasons stated in this memorandum opinion and order Defendants' motion is granted in part and denied in part.

### Facts[1]

In 1965 Bally, then a privately-owned corporation, began manufacturing slot machines. At that time its only United States market was Nevada, and a company and its directors had to be licensed by the State of Nevada in order to sell slot machines there. According to the Complaint, certain "questionable business practices and associations" of some of the directors of Bally, particularly William T. O'Donnell (Bally's president) and Sam W. Klein (Bally's vice-president), prevented Bally from obtaining its own license.

Because Bally was not licensed, it conducted its sales in Nevada through two independent distributors: Bally Sales Company ("Bally Sales") and Currency Gaming Devices, Inc. ("Currency Gaming"). In November 1965 O'Donnell purchased a 30% interest in Currency Gaming for $63,600.98. About a year later the owner of the remain-

Richard F. Watt, Russell Woody, Cotton, Watt, Jones, King & Bowlus, Martha Mills, Chicago, Ill., Stanley L. Kaufman, New York City, Stephen G. Seliger, Chicago, Ill., for plaintiff.

1. This section's statement of facts, as Defendants' initial memorandum in support of their motion puts it, is "drawn from the complaint, plaintiff's answers to interrogatories, deposition testimony, and documents whose authenticity is not disputed by the parties."

ing 70% interest in Currency Gaming (who was also its active manager) decided to retire. As a temporary measure O'Donnell purchased the remaining 70% interest for resale at cost to Currency Gaming's new manager William Redd.[2] In 1969 Bally became a publicly-held corporation as the result of an SEC-registered public offering. In 1972 Currency Gaming, its name having been changed to Bally Distributing Company ("Bally Distributing"), acquired Bally Sales and thus became Bally's sole Nevada distributor.

In 1973 Bally applied for its own Nevada registration to sell and operate slot machines, to enable it to purchase Bally Distributing. Shortly after Nevada registered Bally in 1975, it purchased Bally Distributing for approximately $9.5 million ($1 million to O'Donnell for his then 29.5% interest and the other approximately $8.5 million to Redd for his 69.5% interest and to the remaining 1% shareholder).[3]

Zilker charges that the "questionable business practices and associations" of Bally's directors prevented Bally from obtaining a Nevada license at a much earlier date. Consequently Zilker claims that Bally ought to recover from its directors (1) the approximately $9.5 million paid for Bally Distributing and (2) $250,000 in expenses incurred in securing a license. In addition, the Complaint charges that in 1976 one of Bally's directors, Sam Klein, was seen with a reputed underworld figure. Resulting pressure from the Nevada authorities forced Klein to resign as a Bally director. In settlement of Klein's pre-existing contract, Bally agreed to pay him sums aggregating $576,000. Zilker seeks recovery of that sum from Klein and the other Defendants.[4]

*Demand Under Fed.R.Civ.P. ("Rule") 23.1*

Zilker has not made the demand on Bally's board of directors (the "Board") normally mandated by Rule 23.1 as a prerequisite to every derivative action. Rule 23.1 excuses such demand only if the suing shareholder states with particularity the reasons that the demand would have been futile. Determination of such excusability rests within the sound discretion of the District Court. *Fields v. Fidelity General Insurance Co.*, 454 F.2d 682 (7th Cir. 1971).

Zilker contends any demand was unnecessary because, as Complaint ¶ 11 alleges:

No demand has been made by plaintiff upon BALLY or its board of directors to institute and prosecute an action against the defendants named herein for the acts and transactions complained of, for the reason that all but one of the present directors of BALLY are named as defendants herein, are controlled by defendant O'Donnell as hereinbefore alleged, and are responsible for the acts, transactions and delinquencies herein complained of. No action could be or would be permitted to be instituted by BALLY, without the consent of the defendant-directors of BALLY, and demand upon them would be entirely useless and futile. BALLY's board of directors could not and would not diligently prosecute this action, because by so doing the directors would, in effect, be suing themselves.

It is true that the Complaint alleges no specific wrongdoings by most of the directors. However, after Count I attacks proxy statements used to elect Defendants as directors, the balance of the Complaint is essentially based on an extended course of conduct involving numerous management decisions by the Board. Thus Count II in-

---

**2.** O'Donnell was already licensed in Nevada, as he had to be to own stock in Currency Gaming. When he approached Redd (an experienced distributor) to come to Nevada to manage Currency Gaming, they also agreed to the stock resale to Redd as soon as the latter obtained a Nevada gaming license.

**3.** Redd and the 1% shareholder received an arms-length negotiated price. O'Donnell's price was disproportionately low, O'Donnell in-

sisting on a figure far below fair market value to avoid any possible claim of overcompensation.

**4.** Zilker also initially sought recovery of salaries paid to O'Donnell and Klein. That claim has been dropped because they could assert a corresponding quantum meruit claim (Pl.Mem. 40).

volves a decision by the Board to purchase a distributorship. Counts III, V and VI involve numerous decisions throughout Bally's effort to get a license in Nevada and purchase Bally Distributors. Count IV involves a settlement agreement negotiated with one of the directors after his resignation.

Courts have not been uniform in their approach to the question whether a demand should be excused if the transactions complained of were approved by the board of directors. In *In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir. 1973), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973), the Court held that in cases charging poor business judgment a plaintiff must show more than such mere approval. Other courts, though, have accepted just the bare allegation that demand would be futile. *Liboff v. Wolfson*, 437 F.2d 121 (5th Cir. 1971).

Our Court of Appeals has taken an intermediate position. It has said something more is required than an "empty allegation" that demand would be futile. *Robison v. Caster*, 356 F.2d 924, 926 (7th Cir. 1966). But it does not seem to have accepted the stringent requirements of the First Circuit in *Kauffman.*

*Nussbacher v. Continental Illinois Bank & Trust Company of Chicago*, 518 F.2d 873 (7th Cir. 1975), *cert. denied*, 424 U.S. 928, 96 S.Ct. 1142, 47 L.Ed.2d 338 (1976), is the most recent Seventh Circuit decision in this area. There the Court excused a demand where the board of directors had previously refused to file suit in an almost identical situation and stated generally that demand would be excused if (518 F.2d at 879):

> the majority unaffiliated directors also participated in or even approved of the acts of which complaint was made.

In so doing the Court cited approvingly Judge Coffin's opinion in *Kauffman*, 479 F.2d at 269:

> I find it hard to imagine that a director, however unaffiliated, who had participated, or under these circumstances knowingly acquiesced, in a major transaction, albeit for a corporate purpose, would

authorize a suit, effectively against himself, claiming that the transaction violated the federal antitrust laws. Even independent watchdogs cannot be thought ready to sign a confession of that magnitude.

Zilker's complaint concerns a long course of events involving many decisions either participated or acquiesced in by the entire Board. Under such circumstances there is force in Zilker's argument that a demand on the Board against themselves on Bally's behalf would be a useless formality.

Moreover, Defendants' reply memorandum urges at pages 23–24:

> Had plaintiff complied with Rule 23.1 and made the requisite demand upon Bally's directors to bring this action in the corporation's own name, the board could have referred the matter to a subcommittee of the board of directors comprised solely of outside directors.... If the merits of this complaint had been submitted to a subcommittee of outside directors of Bally, these directors could have determined in their business judgment whether the bringing of this complaint was in the best interest of Bally. In doing so, these outside directors could have determined whether this purported derivative action would benefit Bally or whether this complaint was designed simply to "induce settlement beneficial to the named plaintiff or his counsel."

Unfortunately Defendants' argument proves too much, for there is nothing to have prevented Defendants from taking precisely that action *after* Zilker's complaint was filed. Indeed that has become established practice in derivative actions (evidenced in part by the recurring controversy over whether a board of directors may exercise its business judgment by deciding to discontinue already-filed derivative suits). It should be remembered that on Defendants' motion for summary judgment all reasonable inferences are to be drawn in plaintiff's favor. Defendants' failure to deal with the matter independently for nearly four years supports the

inference that a demand would in fact have been futile and thus defeats summary judgment on this score.

This Court therefore finds that Defendants are not entitled to summary judgment because of Zilker's failure to make a demand under Rule 23.1.

### Count I—Alleged Proxy Violations

■ Complaint Count I alleges that Bally's 1974, 1975 and 1976 proxy statements for the election of directors were materially misleading in violation of Section 14(a) of the 1934 Act and its related Rule 14a–9. Zilker alleges that the proxies contained material omissions in a number of respects, such as non-disclosure of:

(1) O'Donnell's profit on the sale of his Bally Distributing stock to Bally;

(2) other matters relating to O'Donnell's relationship with Bally Distributing; and

(3) the reasons for, and the harm caused by, Bally's failure to sell its products in Nevada directly.[5]

This Court need not reach the question whether the proxies were in fact misleading. As it has previously stated in *Kennedy v. Nicastro*, 503 F.Supp. 1116, 1119 (N.D.Ill. 1980):

Section 14 liability requires that the false or misleading proxy statement had been related to a solicitation for an identifiable transaction.

Zilker has failed to establish that direct nexus between the allegedly misleading proxies and the transactions he seeks to void.

Section 14 actions cannot be grounded on allegations that directors, elected by proxies thus tainted, thereafter during their term of office carried out transactions harmful to their corporation. *Lewis v. Elan* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,013 (S.D.N.Y.1977); *Levy v. Johnson* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,899 (S.D.N.Y.1977). Directors so elected do not become outlaws each of whose actions on behalf of the corporation is rendered voidable. On the contrary, Section 14 actions based on defective proxies have been sustained only as direct attacks seeking to void transactions specifically solicited in the flawed proxy materials or (as a special application of that principle) to void the election of directors and institute new elections. *Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

Zilker's complaint does not meet that standard. Instead it seeks to recoup losses allegedly incurred as a result of various actions taken by the directors, not submitted for shareholder approval in the challenged proxy materials. Accordingly Zilker has failed to allege any facts sufficient to state a claim under Section 14 and its Rule 14a–9, and Complaint Count I must be dismissed.

### Count II—Alleged Rule 10b–5 Violations

In Count II Zilker alleges that Bally's directors deceived Bally in connection with the purchase of Bally Distributing. Because Bally purchased Bally Distributing by acquiring all its outstanding shares, Zilker alleges that the acts of the directors constituted a "fraud and deceit upon Bally" in violation of Section 10(b) of the 1934 Act and related SEC Rule 10b–5.

This Court need not reach the sufficiency of Zilker's substantive claims or Defendants' other arguments,[6] for it is bound by

---

5. Although this action is brought as a shareholders' derivative suit, Bally itself could not have been deceived by the allegedly misleading proxies. Zilker's claim must be predicated on the nation that Bally was harmed by the fact that its shareholders were deceived.

6. Defendants also urge that the only alleged misleading omissions were in Bally's own proxy statements. Indeed Count II relies on the claim that all the facts were *known* to the defendant directors. By definition, then, it would appear that Bally (which acted through its allegedly culpable directors and not its shareholders) could not have been deceived. That too would be fatal to Zilker's derivative claim under Count II. See last week's decision of our Court of Appeals discussing the "reliance" requirement in Rule 10b–5 actions.

the definitive construction of the term "security" announced by our Court of Appeals earlier this year. In *Frederiksen v. Poloway*, 637 F.2d 1147, 1148 (7th Cir. 1981), the Court stated:

> Not all sales transactions which involve "stock" are necessarily covered by the securities laws. Rather, the test for coverage, in general, is whether the purchaser is placing money in the hands of another who will control the funds and the business decisions. If, however, the purchaser is assuming control of the critical decisions of the corporation, then the transaction is not considered to involve "securities."

In those terms the *Frederiksen* holding (637 F.2d at 1151–52) paraphrases directly to the Bally Distributing-Bally transaction:

> Here, in contrast to the situation in *Coffin* [*v. Polishing Machines, Inc.*, 596 F.2d 1202 (4th Cir. 1979)], the transaction did not involve a sale of corporate stock to raise capital for profit-making purposes. [Bally] sought to acquire [Bally Distributing's] business in its entirety. The "stock" sale was a method used to vest [Bally] with ownership of that business. There was no offer of investment "securities." The stock of [Bally Distributing] merely was passed incidentally as an indicia of ownership of the business assets sold to [Bally].

Still in *Frederiksen's* terms, Bally, in purchasing all of the stock of Bally Distributing, was "assuming control of the critical decisions of the corporation." Hence under *Frederiksen* no "securities" were involved and no 1934 Act liability exists.

Zilker seeks to distinguish *Frederiksen* on the ground that it applies only to the purchase of non-publicly held corporations. Such a distinction does not withstand analysis. *Frederiksen* referred to the definition of "security" in *both* the 1934 Act and Securities Act of 1933, and its analysis was in no way dependent on the size or nature of the acquired enterprise. Instead the decision

*Panter v. Marshall Field & Co.*, 646 F.2d 271 at 284–285 (7th Cir. 1981).

was based on the *purpose* of the purchase: business acquisition v. investment securities acquisition. Because this Court must follow *Frederiksen*, Zilker's reductio ad absurdum arguments should be addressed to the Court of Appeals rather than to this Court. Complaint Count II must be dismissed as well.

### Counts III, IV, V and VI—Alleged Breaches of Fiduciary Duty

Counts III through VI charge Bally's directors with numerous breaches of their fiduciary duty to Bally.[7] Each allegation under those counts must be examined individually.

### 1. *$9.5 Million Purchase Price of Bally Distributing*

Zilker asserts Bally's right to recover the approximately $9.5 million it spent to acquire Bally Distributing. Zilker concedes that the $9.5 million was a fair price for Bally Distributing but claims that the imposition of that cost on Bally was unnecessary. According to the complaint the money was spent solely because the questionable business practices and associations of the directors, particularly O'Donnell and Klein, prevented Bally from receiving its own license to distribute slot machines in Nevada.

Because the thrust of Zilker's complaint is that Bally's best interests are served by distribution of its own products in Nevada, by definition the *decision* to purchase the distributorship cannot be a breach of the directors' fiduciary duty. Nor can the payment of a fair price to implement that decision constitute such a breach. Thus the only directors' action of which Zilker can complain must be the failure to decide earlier to rid the corporation of O'Donnell and Klein, thereby enabling Bally to obtain a Nevada license earlier and purchase Bally Distributing at a much lower cost. On Zilker's theory payment of the $9.5 million price was the harm produced by the action (or inaction) of the Board, but once again the

7. Jurisdiction over those counts is based on diversity of citizenship.

claimed fiduciary breach must be the decision not to seek such a license at an earlier date.

Although neither party has pinpointed the precise time when the decision to seek a license was made by Bally's directors, Complaint ¶ 23 states that a license was granted in 1975 "after several years of investigation" by the Nevada Gaming Commission. Accordingly Bally's decision to seek to obtain its own Nevada license *must* have been made before April 1974, when Zilker acquired his stock.

■ Rule 23.1 requires that "the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains...." Because the "transaction of which he complains" is the directors' failure to make the Nevada licensing decision as early as it allegedly should have been made (when Bally Distributing could have been bought more cheaply) and Zilker was not a shareholder at that earlier time, he has no standing to assert the derivative action in the complaint.

In certain situations a derivative action can be based on what is termed a "continuing wrong." For example, in *Palmer v. Morris*, 316 F.2d 649 (5th Cir. 1963) the plaintiff was permitted to attack a corporation's rental payments even though the contract was signed before plaintiff purchased his stock. But in that case the payments that continued after his purchase were exorbitant and were for services of no use to the corporation. Thus the payments *themselves* constituted a wrong that continued after the contract. Indeed all of the cases involving the so-called "continuing wrong" specify something—unlike the situation here—that the corporation should not have done *after* the date on which the plaintiff purchased stock. *See Lawson v. Krock*, 17 Fed.R.Serv.2d 700 (4th Cir. 1973); *Bateson v. Magna Oil Corporation*, 414 F.2d 128 (5th Cir. 1969).

Much more to the point is our Court of Appeals' decision in *Weinhaus v. Gale*, 237 F.2d 197 (7th Cir. 1956). In *Weinhaus* defendants paid $10 million to purchase from plaintiff's corporation securities that were actually worth some $16 million. Defendants' purchase occurred before plaintiff acquired stock in the defrauded corporation, but defendants sold the stock for a profit after plaintiff had acquired his stock. As the Court stated in language applicable to this case (237 F.2d at 200):

> That wrong, if such it be, was neither enhanced nor diminished by anything that subsequently took place. The fact, unexplained, that such shares were sold by Edison almost a year later at a greatly increased price might tend to prove they were purchased from Gas Company for less than their true value, but such sale certainly did not constitute a wrong to plaintiff and other stockholders of Gas Company.

In this case the only possible wrong committed was the act of *not* seeking a license at an earlier time. As in *Weinhaus*, a $9.5 million purchase price might tend to prove that there had been a breach of fiduciary duty, but the purchase itself cannot constitute an unlawful action. *See*, Wright and Miller, *Federal Practice and Procedure: Civil* § 1828 at 346.

There is one aspect of the post-Zilker-purchase Bally Distributing transaction that poses a different problem. True enough, the total $9.5 million price was admittedly fair, and O'Donnell's $1 million was less his pro rata share of that price. But Zilker contends that O'Donnell, a Bally director, should have turned over his Bally Distributing interest to Bally at his cost because he was part of the reason that Bally was forced to incur that cost.

■ Were there such a breach of fiduciary duty, it would have occurred after Zilker purchased his stock and therefore could be asserted by Zilker. However, that allegation would state a cause of action only if O'Donnell were in some way responsible for the claimed "delay" in Bally obtaining its license to sell in Nevada. For if O'Donnell were not so responsible, there is no reason that he should not have been entitled to receive a fair price (in this case he received less than a fair price) for his shares.

Zilker has presented no facts in support of the assertion that O'Donnell was responsible for any difficulty Bally had in receiving a Nevada license. As Defendants point out, O'Donnell himself was personally licensed to sell slot machines in Nevada from 1965 to the present date. It is true that when Nevada undertook its initial examination of Bally's license request, the Nevada Gaming Control Board (the "Control Board") recommended that three officers, including O'Donnell, resign before license be granted. But the Nevada Gaming Commission (the "Commission"), the final authority, rejected that recommendation and granted Bally's license. So there has been no showing that O'Donnell was responsible for difficulty (if any) Bally had in obtaining a license.

Because O'Donnell was thus not personally responsible for any claimed "harm" to Bally, he committed no breach of fiduciary duty by selling his shares for more than his cost (and for less than a fair price). If Zilker's argument is that O'Donnell, with the other directors, failed to get Bally licensed earlier, he is defeated by this opinion's prior discussion that any such "breach" occurred before Zilker purchased his stock.

For the several reasons stated in this section, Defendants are entitled to summary judgment on Zilker's derivative claim for the approximately $9.5 million purchase price paid for the Bally Distributing stock.

## 2. Investigation Costs

Zilker seeks to recover the approximately $250,000 Bally spent in connection with the licensing proceeding before the Commission. Again the allegation is that such expense was necessary only because of the questionable business practices and associations of O'Donnell and Klein and other persons affiliated with Bally.

That claim has two fundamental weaknesses:

■ First, Bally began to seek a license in Nevada before Zilker purchased his stock. To cut down on the investigation expenses, Bally would have had to "expunge" its company of bad influences be-

fore seeking the license. In that way the problem is much the same as with the $9.5 million purchase price, for again the whole thrust of Zilker's complaint is that Bally must distribute its own products in Nevada. On that score he can complain only of Bally's failure to expunge itself of "bad influences" before seeking a license. That failure in turn occurred before Zilker's ownership of Bally stock.

■ As a second and independent defect, Zilker presents no facts to demonstrate that the $250,000 expenditure resulted from the questionable business associations and practices of any Bally director. As already stated earlier, though the Control Board found some problems with Bally's license application, the Commission did license Bally. Zilker has made no showing that the licensing proceeding was unusually protracted or complex or that the questionable business associations and practices of Bally's directors forced Bally to incur any unnecessary expense.

## 3. Bally's Settlement Contract with Klein

■ Zilker's final allegation is that Bally should not have entered into the settlement contract under which Klein was paid $576,000 for resigning as a Bally director. Effectively Zilker claims it was a breach of fiduciary duty for Bally's Board not to terminate their relationship with Klein without compensation. Defendants respond that approximately $400,000 remained to be paid Klein on his employment contract, that to do as Zilker suggests surely would have resulted in litigation and that negotiation of the settlement was a valid business judgment.

Zilker has really made two claims:

(1) It was a breach of fiduciary duty for Klein as a director to accept the money.

(2) It was a breach of fiduciary duty for the Board to pay the money to Klein. Although there is a presumption in favor of business judgments made in good faith, the issue presented here cannot be resolved on a motion for summary judgment. It is clear

that Klein resigned under pressure from the Commission, and the Court cannot say as a matter of law whether or not the settlement contract constitutes a breach of fiduciary duty on the part of Bally's directors. Because the facts permit conflicting inferences, a triable issue of fact remains.

### Conclusion

As to each of Counts I, II, III, V and VI there is no genuine issue as to any material fact and Defendants are entitled to a judgment as a matter of law. As to Count IV, however, which seeks reimbursement of all monies paid to Klein on the 1976 settlement contract, material fact issues do exist and Defendants' motion for summary judgment is therefore denied.