**Arthur GOLDEN and Gladys Golden,
Plaintiffs-Appellants,**

v.

**Anthony GARAFALO,
Defendant-Appellee.**

**No. 694, Docket 81–7693.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 10, 1982.

Decided May 5, 1982.

Edward Labaton, New York City (John H. Riley, Richard K. Rosenblum, Kass, Goodkind, Wechsler & Labaton, New York City, of counsel), for plaintiffs-appellants Arthur Golden and Gladys Golden.

William B. Aronstein, New York City (Milton Waxenfeld, Warshaw Burstein Cohen Schlesinger & Kuh, New York City), for defendant-appellee Anthony Garafalo.

Before LUMBARD, NEWMAN and WINTER, Circuit Judges.

RALPH K. WINTER, Jr., Circuit Judge:

This appeal raises another of the recurrent and troubling questions[1] as to the legal status of certain instruments under the Securities Act of 1933 (the " '33 Act") and the Securities Exchange Act of 1934 (the " '34 Act") (collectively, the "Acts").

Plaintiffs purchased 100% of the outstanding stock of a corporation engaged in the ticket brokerage business from defendant, the sole stockholder. Plaintiffs intended to manage the business directly. The corporation presumably had the customary assets, owned the corporate name, and had non-assignable leasehold rights to certain office space. We may assume the lease was decisive in determining that the transfer would be by way of a sale of shares rather than assets.

Alleging that defendant had made misrepresentations relating to the value of the business, and, therefore, the value of the shares of stock, plaintiffs brought this action under Section 17(a) of the '33 Act, 15 U.S.C. § 77q; Section 10(b) of the '34 Act, 15 U.S.C. § 78j(b); and Rule 10b-5 promulgated under Section 10(b), 17 C.F.R. 240.-10b-5. Other counts of the complaint alleged a variety of common law and state claims.

Judge Conner dismissed the complaint. In a careful and thoughtful opinion, reported at 521 F.Supp. 350, he utilized what has come to be known as the "sale of business" test and concluded:

> . . . where the reality of the transaction was the sale of an entire small business to be operated by the purchaser, the protective purpose of the federal legislation is not implicated. Here there is no publicly traded security nor any passive investor entrusting his capital to another in hopes of profit. To apply the federal securities laws to such a transaction simply because of the incidental transfer of stock would bring within the ambit of the Acts the transfer of any conceivable item, as long as the deal was structured as the purchase and sale of the stock of a corporation holding that item as an asset, even if the corporation held no other assets. The federal securities laws were not designed to usurp the common law where the reality of the transaction is the transfer of a tangible item for the use of the purchaser.

*Id.* at 358 (citations omitted).

Although that conclusion is not unreasonable, we disagree and reverse. We hold that conventional stock in business corporations is a security within the meaning of the '33 and '34 Acts whether or not the underlying transaction involves the sale of a business to one who intends to manage it.

THE SALE OF BUSINESS DOCTRINE

The sale of business doctrine finds its most explicit origins in *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir.), *cert. denied*,

---

1. *See Marine Bank v. Weaver,* —— U.S. ——, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982); *Int'l. Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *SEC v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), which held that a sale of a business effectuated by a transfer of stock does not involve a "security" within the meaning of the '33 or '34 Acts when the "economic reality" of the transaction is "commercial" —acquiring a business to manage—rather than "investment"—receiving income from capital without managerial effort. *See also Chandler v. Kew, Inc.*, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,966 (10th Cir. 1977).

The statutory definition of "security" in each Act[2] includes words such as "stock," "note," "treasury stock," "bond," "debenture," "voting trust certificate," "certificate of interest," "investment contract" or "any instrument commonly known as a 'security.'" Each definition, however, begins with the language " ... unless the context otherwise requires ...," words which the sale of business doctrine reads to limit the inclusion of the instruments subsequently named to "contexts" in which the principal protective purposes of the Acts are directly involved. Where, as Judge Conner argued, "there is no publicly traded security nor any passive investor entrusting his capital to another ...," 521 F.Supp. at 358, the "context otherwise requires," and there is no "security" within the meaning of the Acts.

The *Frederiksen* Court based its holding on *United Housing Foundation v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), and *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), which are said to establish a three-part "economic reality" test to determine what is a "security" in particular "contexts." The elements of the test area: (1) an investment in a common venture, (2) premised on a reasonable expectation of profits, (3) to be derived from the entrepreneurial or managerial efforts of others. *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060; *Howey*, 328 U.S. at 301, 66 S.Ct. at 1104.

Although the sale of business doctrine has been relied upon in a growing number of cases,[3] its contours remain uncertain. *See generally* Seldin, *When Stock is Not a*

**2.** Section 2(1) of '33 Act, 15 U.S.C. § 77b(1) reads:

(a) ... unless the context otherwise requires—
(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

\* \* \* \* \* \*

Section 3(a)(10) of '34 Act, 15 U.S.C. § 78c(a)(10) reads:
(a) ... unless the context otherwise requires—

\* \* \* \* \* \*

(10) The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment con-

tract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing, but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited....

**3.** In addition to *Chandler* and *Frederiksen*, *see Canfield v. Rapp & Son, Inc.*, 654 F.2d 459 (7th Cir. 1981); *Tech Resources, Inc. v. Estate of Hubbard*, 245 Ga. 583, 272 S.E.2d 314, [1980 Transfer Binder] Fed.Sec.L.Rep. ¶ 97,677 (1980); *Reprosystem v. SCM Corp.*, 522 F.Supp. 1257, [1981 Transfer Binder] Fed.Sec.L.Rep. ¶ 98,207 (S.D.N.Y.1981); *Oakhill Cemetery of Hammond, Inc. v. Tri-State Bank*, 513 F.Supp. 885 (N.D.Ill.1981); *Zilker v. Klein*, 510 F.Supp. 1070, [1981 Transfer Binder] Fed.Sec.L.Rep. ¶ 97,492 (N.D.Ill.1981); *Anchor-Darling Industries, Inc. v. Suozzo*, 510 F.Supp. 659 (E.D.Pa.1981); *Barsy v. Verin*, 508 F.Supp. 952 (N.D.Ill.1981); *Dueker v. Turner*, [1979–1980 Transfer Binder] Fed.Sec.L.Rep. ¶ 97,386 (N.D.Ga.1979); *Bula v. Mansfield*, [1979 Transfer Binder] Fed.Sec.L.Rep. ¶ 96,964 (D.Colo.1977).

*Security: The "Sale of Business" Doctrine Under the Federal Securities Laws,* 37 Bus.Law 637 (1982). A transaction involving a transfer of 100% of the shares of a business corporation between old and new managers is clearly within the doctrine since elements (1) and (3) of the "economic reality" test cannot be met. The Seventh Circuit has also stated that an instrument may be a "security" as to some parties to a transaction but not as to others. An example is the purchase of 100% of shares by a new manager from a number of persons including passive investors. The protection of the Acts would continue to extend to the passive investors who sold the stock, but not to the new managers. *McGrath v. Zenith Radio Corp.,* 651 F.2d 458, 467–68 n.5 (7th Cir. 1981). One District Court appears to have held that purchase of a control block of stock by a new manager is within the doctrine even though the transaction involved less than 100% of the outstanding shares. *Oakhill Cemetery of Hammond, Inc. v. Tri-State Bank,* 513 F.Supp. 885 (N.D.Ill.1981). That holding seems logical since, as to the new manager, the purchase is a purchase of a business. Element (3) of the "economic reality" test, moreover, cannot be met as to the purchaser.

An unresolved issue is whether the purchase of 100% of the shares of a corporation by one who delegates management to others comes within the doctrine. While element (3) of the "economic reality" test is arguably met, the power to change managers or assume direct control is ever present, as is the power to "suggest" managerial decisions. Element (1) would not be present because there is no investment "in common" with others, although there would seem to be little difference in principle between this case and one in which one person held 80% of the stock while several others shared the remaining 20%.

The effect of the sale of business doctrine is also unclear in cases involving a purchase of a large block of shares from a corpora-

tion by one intending to manage jointly with another. *See Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir. 1979) (rejecting sale of business doctrine); *Frederiksen,* 637 F.2d at 1151 (distinguishing *Coffin* on the grounds that the sale of stock raised capital for the corporation).

The doctrine has not been limited to closely held corporations. *See Zilker v. Klein,* [1981 Transfer Binder] Fed.Sec.L. Rep. ¶ 97,992 (N.D.Ill.1981); *Reprosystem v. SCM Corp.,* 522 F.Supp. 1257, [1981 Transfer Binder] Fed.Sec.L.Rep. ¶ 98,207 (S.D.N.Y.1981), involving an acquisition or divesting of another corporation by a publicly held company.

Nevertheless, whatever the full scope of the sale of business doctrine, there is no doubt that, if it is valid, it would apply to the present case, involving as it does 100% of outstanding shares and an intent to manage.

A number of courts have rejected the doctrine. *E.g., Coffin, supra; Occidental Life Insurance Co. v. Pat Ryan & Associates, Inc.,* 496 F.2d 1255 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974).[4] They have argued that the "economic reality" test applies only to instruments which are not securities in the ordinary or conventional sense of the term or which contain unusual or unique features and are thus difficult to classify under statutory or common law standards. *See Bronstein v. Bronstein,* 407 F.Supp. 925, 929 (E.D.Pa.1976). Those cases hold that where, as in the present case, the shares of stock qualify under local corporation and commercial law as ordinary stock, no further examination of the underlying transactions is necessary absent some reason to think they are not what they seem. *See Coffin,* 596 F.2d at 1204. Those cases have also argued that allowing the application of the anti-fraud provisions of the securities laws to turn upon the percentage of shares involved in a transaction would lead to "capricious" results. *Occidental Life Ins. Co.,* 496 F.2d at 1263.

---

4. *See also Glick v. Campagna,* 613 F.2d 31 (3d Cir. 1979); *Mifflin Energy Sources, Inc. v. Brooks,* 501 F.Supp. 334 (W.D.Pa.1980); *Titsch* *Printing, Inc. v. Hastings,* 456 F.Supp. 445 (D.Colo.1978); *Bronstein v. Bronstein,* 407 F.Supp. 925 (E.D.Pa.1976).

## SUPREME COURT PRECEDENT

Although *Howey, Forman* and the recent decision in *Marine Bank v. Weaver,* —— U.S. ——, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), are not dispositive as to the validity of the sale of business doctrine, they do support its rejection.

*Howey* involved the sale of citrus acreage in small plots along with a "service contract" which leased the land back to the original owner who grew and sold the crops, a share of the profits going to the purchaser. This unusual arrangement raised an obvious legal issue as to the applicability of the securities laws and the "economic reality" test was used to determine whether the transaction fell within the meaning of the catch-all phrase "investment contract."

*Forman* involved facts at the other end of the spectrum. In that case, subsidized, low-income housing in Co-op City was obtained by purchasing 18 shares of "stocks" in Riverbay Corp. for each room desired. The cost of each share was, for practical purposes, permanently fixed at $25. Shares could be transferred only to a new occupant of the particular apartment and were thus the equivalent of a recoverable deposit given by a lessee. They could not be pledged or encumbered and had no voting rights, since each apartment, notwithstanding the number of rooms, had one vote.

The Court held that "stock" in Riverbay was not a "security" within the '33 and '34 Acts. The fact that the parties called the instruments "stock" was not "wholly irrelevant," but it was also "not dispositive," since inquiry into "economic reality" was not foreclosed by use of the name alone. 421 U.S. at 850, 95 S.Ct. at 2059. Since the Riverbay shares lacked all of the characteristics of stock save the name—*i.e.,* right to receive dividends, negotiability, voting rights in proportion to number of shares owned, possibility of appreciation in value—the Court concluded that they were not "stock" within the meaning of the Acts. 421 U.S. at 851, 95 S.Ct. at 2060.

The Court then went on to discuss whether the Riverbay shares might fall within the catch-all phrase "investment contract" and applied the three-pronged "economic reality" test of *Howey.* The Riverbay shares failed to qualify under this test either. 421 U.S. at 851–58, 95 S.Ct. at 2060–63.

*Marine Bank v. Weaver* involved a certificate of deposit pledged with the issuing bank to secure a loan to a corporation. The plaintiffs contracted with the corporation for certain benefits including a portion of any profits in return for providing the collateral. The Court indicated that the definition of security included "ordinary stock," —— U.S. at ——, 102 S.Ct. at 1223, and "instruments ordinarily and commonly considered to be securities in the commercial world . . . ." *Id.* at ——, 102 S.Ct. at 1225. It held, nevertheless, that the certificate of deposit was not a security because of the fixed rate of interest and virtual guarantee of full payment, as well as the abundant protection afforded such instruments under the banking laws. The contract was held not to be covered by the Acts since it was a unique agreement, negotiated one on one, which did not have equivalent values to most persons and could not be traded publicly. *Id.*

These decisions are not dispositive of the issue before us. There is language in them suggesting the importance of "economic realities," *Forman,* 421 U.S. at 848–49, 95 S.Ct. at 2058–59, yet there is also language stressing that "ordinary stocks" are to be treated as a "security" under the Acts, *Marine Bank,* —— U.S. at ——, 102 S.Ct. at 1223. Nevertheless, they lend support to the view that conventional stock is a security whether or not the underlying transaction involves a sale of business.

First, *Howey, Forman* and *Marine Bank* treat the determination of whether a particular instrument is a "security" under the '33 and '34 Acts as one which does not vary from time to time depending upon the relative holdings of the parties or their intentions in a particular transaction. Only changes in the instruments themselves, and drastic ones, would convert the Riverbay shares into "stock." The sale of business doctrine, on the other hand, treats an instrument as a "security" for some purposes

but not for others. *See ante* at 1141–42. Whereas prior cases have focused on the nature of the instrument, the sale of business doctrine focuses on the nature of particular transactions involving the instrument. To be sure, this hardly forecloses the issue, but it does underline the fact that the sale of business doctrine is more than an incremental extension of *Forman.*

Second, with the exception of the certificate of deposit in *Marine Bank,* each case involved unique or idiosyncratic instruments. Any language suggesting that the three-pronged "economic reality" test fashioned in *Howey, supra,* is the exclusive determinant of the status of instruments as "securities" under the Acts is, therefore, *dicta.*

Third, and most important, *Forman* applied a two-part, seriatim test. The first part asked whether the shares in Riverbay were "stock" and looked to the characteristics usually associated with such instruments: right to dividends, transferability, right to pledge, voting rights in proportion to shareholdings, and ability to appreciate in value. 421 U.S. at 851, 95 S.Ct. at 2060. These criteria seem more concerned with legal status than "economic reality." Having first determined that the Riverbay shares were not stock, the Court went on to determine whether they were an "investment contract" and applied the three-pronged "economic reality" test of *Howey.* The actual analysis utilized in *Forman,* therefore, is inconsistent with the sale of business doctrine. If "economic reality" is the universal jurisdictional test under the Acts, no matter what the facial or legal character of the instrument, there was no need to examine whether the Riverbay shares were stock according to conventional criteria, since an affirmative answer would have been irrelevant. The doctrine thus seems to assume that a major part of the discussion in *Forman* was pointless.

## DISCUSSION

We reject the sale of business doctrine. The instruments in question are stock for purposes of local corporation and commercial law and federal, state, and local tax law. Holders are entitled to dividends as provided under New York Business Corporation Law, to transfer the shares to others, to pledge them as collateral, to cast one vote per share on matters fit for shareholder action, and to realize an appreciation in their value.

We think the term "stock" in the definition of "security" in the '33 and '34 Acts should be read to include instruments, such as these, which have the characteristics associated with ordinary, conventional shares of stock. There was little reason for the drafters to use words such as "stock," "treasury stock" or "voting-trust certificate", unless their intention was to include all such instruments as commonly defined. If an "economic reality" test were intended, reference to such specific types of instruments, and common variations of them, would have been inappropriate because a substantial portion of each class of instrument would, in fact, not be within the definition. We believe that Congress intended to draft an expansive definition and to include with specificity all instruments with characteristics agreed upon in the commercial world, such as "debentures," "stock," "treasury stock" or "voting-trust certificates." Catch-all phrases such as "investment contract," were then included to cover unique instruments not easily classified. If the "economic reality" test were to be the core of the definition, only general catch-all terms would have been used.

We are cited to no legislative history contradicting this perfectly plausible reading of the statutory language. The House Report accompanying the bill which became the '33 Act indicated that the definition of "security" was intended to cover "the many types of instruments that in our commercial world fall within the ordinary concept of a security." H.R.Rep.No.85, 73d Cong., 1st Sess. 11 (1933). We regard this statement as support for the proposition that instruments ordinarily regarded as "stock" are a "security," notwithstanding that the underlying transaction involves a transfer of control. This understanding of Congressional intent, moreover, has been almost universally accepted by the courts, the relevant

agency and the bar for over 40 years. Only after *Forman* has there been a serious challenge to this reading of the statutes.

Our prior cases fully support this view. In *Movielab, Inc. v. Berkey Photo, Inc.*, 452 F.2d 662 (2d Cir. 1971), we held that two 8% installment notes, in the amount of $5,250,-000 each, given by Movielab to Berkey and payable over 20 years were "securities" because they were "notes." In "economic reality," the transaction was merely a sale of assets on credit and, therefore, of a commercial, rather than investment, nature. We have reaffirmed *Movielab* in a post-*Forman* decision. *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1133 (2d Cir. 1976). Judge Friendly's opinion in that case noted the "dubious value" of the *Howey* "economic reality" test in the context of determining what kind of "notes" are "securities," *id.* at 1136, and suggested that even in the light of *Forman*, "the best alternative ... may lie in greater recourse to the statutory language." *Id.* at 1137. We agree fully with Judge Friendly that however great the merits of the *Howey* test in determining what falls within the catch-all phrase "investment contract," it is of little help in determining the meaning of more specific words which refer to instruments with commonly agreed upon characteristics, such as "stock."

Our differences with *Frederiksen, supra*, and with Judge Conner, perhaps lie in our conviction that Congress may have had good reason to rely on conventional commercial and legal criteria for classifying such instruments. At least the use of such criteria avoids the danger of allowing the application of the '33 and '34 Acts to turn on uncertain and slippery factors, case by case.

As discussed above, *ante* at 1141–42, the contours of the sale of business doctrine are unclear. We attribute that lack of clarity not to the doctrine's infancy but to its inherent elusiveness as a legal concept. For example, a purchaser's intent to manage a corporation may be critical under the doctrine, but that is a very difficult issue to resolve on the basis of conflicting, self-serving testimony. It will, moreover, raise

countless issues of application of the legal rules to particular facts. In *Frederiksen* itself, the transaction included an employment agreement under which the defendant-seller was to continue to be available to manage the business for a salary and to receive commissions which looked suspiciously like a right to share in the profits. Because the underlying agreements left no doubt that the buyer, who appears to have had no experience in the particular kind of business, had ultimate control, the Court applied the sale of business doctrine. These facts have led even an enthusiast of that doctrine to suggest that *Frederiksen* involved "a close, and possibly questionable, factual judgment...." Seldin, *When Stock is Not a Security, supra*, 37 Bus.Law at 643.

*Coffin, supra*, involved a purchaser of half the shares of a corporation who left his previous employment to become executive vice president of the corporation. Because the Fourth Circuit does not recognize the sale of business doctrine, it had no difficulty in finding jurisdiction under the Acts. *Frederiksen*, however, indicates that the Seventh Circuit would follow *Coffin* because the sale of stock raised capital for the corporation. 637 F.2d at 1151. Nevertheless, the "economic reality" of that transaction is simply a conversion of an individual proprietorship into a partnership. In fact, the *Coffin* court stated:

> When ordinary corporate stock is involved in a transaction, we likewise need not consider whether the parties could have structured their arrangement in some other form. The parties in this case chose to implement their plan for joint ownership by means of a stock transfer rather than a partnership agreement or a sale of assets. Having decided to deal in stock, they brought their transaction under the provisions of the federal securities statutes.

596 F.2d at 1204. If anything, *Coffin* seems a stronger case for application of the sale of business doctrine than *Frederiksen*.

If intent to manage is relevant, adoption of the doctrine will lead to countless issues

of mixed fact and law such as whether part-time managers are passive or active, what classification to accord controlling shareholders who intervene sporadically, and the status of new investors who assume ambiguous roles as employees or who intend initially to remain passive but are soon forced into management roles.

Discarding intent to manage and focusing on transfers of control—which for these purposes can be defined as actual power to select the management—does not reduce the doctrine's elusiveness when applied to particular facts. In "economic reality," considerably less than 100%, and often less than 50%, of outstanding shares may be a controlling block which, when sold to a single holder, effectively transfers the power to manage the business. Actual control depends upon number and dispersal of shareholders, whether they be individuals, other businesses or institutional investors, and a variety of other facts which render control a most uncertain test.

The sale of business doctrine in the end turns upon the distinction between commercial and investment transactions. That is a distinction which, in the context of transfers of corporate stock, appears to us to be of most dubious value. For example, plaintiffs in this case no doubt hoped to reap the business' profits in the form of salary, but that form is dictated by tax laws which subject dividends to double taxation. Who is to say that plaintiffs did not hope at some future date to resell the shares and realize an appreciation in their value, like investors in "growth" stocks which pay little or no dividends. The allegation in this case is that plaintiffs paid defendant over $100,000 more than the net asset value of the business. In truth, purchasers of a business rightly regard themselves as investors as well as managers. Transfers of corporate control frequently are motivated by a hope for capital gains resulting from improved management, and it is altogether artificial to classify such transactions as exclusively commercial.

Congress thus may have had good reason to draft the definition of "security" so as to include all instruments having commonly agreed upon characteristics, such as "stock," leaving "economic reality" to govern only the catch-all phrase "investment contract" in cases involving unusual or unique instruments. The dangers in creating uncertainty as to the scope of the Acts and in generating slippery legal and factual issues going to jurisdiction are substantial. We regard that as having been the legislative judgment, and we give it force.

Judge Conner was correct in arguing that this interpretation results in a certain overbreadth in application. The overbreadth is the consequence of the fact that Congress' core concern was protection of the individual investor trading in public markets for shares of firms about which information is available only through intermediaries. The Acts, on the other hand, apply to stock even when traded in face-to-face transactions in which the parties can demand firsthand information. In the latter case, a seller or purchaser can secure protection through contract with the parties who control the corporation and have access to the actual facts. We believe, however, that the sale of business doctrine is misdirected even as a means of curing this overbreadth. The overbreadth is not limited to transactions in which control of a business is transferred but exists in every case in which the parties include those who control the corporation and engage in a negotiated rather than a market transaction. So far as the antifraud policies of the Acts are concerned, the possibilities of fraud and the ability to protect oneself through contract are the same as to a "passive" investor buying 30% of a corporation's shares from a sole shareholder or an "active" purchaser taking 100% and expecting to manage it directly. So far as curing the overbreadth of the Act is concerned, therefore, the relevant distinction is between transactions in a public market for stock and negotiated transactions involving close corporations, whether or not they involve transfers of control. We take it, however, that the Act has always been understood to apply to transactions in shares of close as well as publicly held corporations and to negotiated as well as market sales

and purchases of shares. *See Sup't. of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). *Forman* provides us no reason to reexamine that understanding. If the Congress is dissatisfied with the present scope of the Acts, we trust it will act accordingly.

LUMBARD, Circuit Judge, dissenting:

I dissent. The majority today extends the protections of the securities laws to plaintiffs not in need of those protections, thereby adding to the burdens on the federal courts without furthering any of Congress's purposes in enacting those laws. I would affirm the judgment of the district court dismissing the complaint for want of subject matter jurisdiction.

## I.

The defendant, Anthony Garafalo, owned and operated a ticket brokerage business in New York City, conducted under the name of Mackey's Inc. ("Mackey's").* This business consisted of buying and reselling tickets to various sporting, theatrical, and other entertainment events.

In the fall of 1980, Garafalo entered into negotiations with the two plaintiffs, Arthur and Gladys Golden, for the sale of his business. The Goldens were already engaged in the ticket brokerage business at that time. The two parties reached a basic agreement on terms in November 1980. Garafalo then contacted his lawyer, William B. Aronstein, and informed him of the basic terms of the proposed sale.

After speaking with Garafalo, Aronstein telephoned the Golden's counsel, Edward Labaton, to work out the details of the sale. The two lawyers discussed whether the sale should take the form of a sale of assets or a sale of stock; after Aronstein informed Labaton that the lease of the premises in which Mackey's was located contained a non-assignment clause, the two agreed to proceed by a sale of 100% of the stock in Mackey's.

The contract of sale was signed and the closing took place on December 31, 1980. The contract provided that the Goldens would pay an amount equal to the "Net Assets" of Mackey's, plus $108,296 payable in two installments. The lease of the premises and the 49 shares of Mackey's stock, constituting 100% of the outstanding shares, were put in escrow pending payment of the two promissory notes evidencing the installment debts. Delivered to the Goldens were the resignations of all the officers and directors of Mackey's; the corporate minute books and corporate seal; all the business records, files, and account books relating to Mackey's; and all the contracts pertaining to the business.

Simultaneously with the signing of the sales contract, the parties entered a consulting agreement. This recited that Garafalo had "sold his interest in Mackey's" and "is no longer employed by Mackey's," but was contracting as an "independent contractor" to provide consulting services to Mackey's upon reasonable notice for $100 per day. Garafalo's obligation to provide such services was not to exceed 150 days during the year 1981. He further agreed not to compete with Mackey's for a period of five years.

Although the Mackey's stock was to remain in escrow pending final payment of the purchase price, the parties understood that the Goldens were to operate the business as they saw fit. The escrow agreement stated that "Mackey's will continue to conduct its business solely in the usual and ordinary course thereof . . . ." On the day of the closing, Labaton sent Aronstein a letter in which he acknowledged their understanding that under the escrow agreement, "the new owners will have full operational control of the business and may change currently existing practices and policies."

Apparently dissatisfied with the business they had purchased, the Goldens sued for

---

* The Manhattan telephone directory lists a ticket broker under the name of "Mackey's" at 210 West 44th Street.

recission and damages under the Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a); the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b); and under Rule 10b–5, 17 C.F.R. 240.10b–5. Appended to these claims were claims under state law. The Goldens claimed that Garafalo had overstated the value of his business by exaggerating the percentage of corporate, as opposed to individual, customers that it served, and that the financial statements delivered by Garafalo overstated the business's sales and income.

Judge Conner dismissed the complaint, relying on *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), in holding that the stock purchased by the Goldens was not a "security" under the securities laws and that the court therefore lacked subject matter jurisdiction. 521 F.Supp. 350 (S.D.N.Y.1981). I agree with Judge Conner substantially for the reasons stated in his thoughtful opinion and write separately here only to address the points made by the majority.

## II.

The majority interprets *Forman* to require a "two-part, seriatim test," asking first whether the instrument constitutes "stock" as that term is commonly understood, and only then, if it is not stock, asking whether it is an "investment contract" under the economic reality test. This interpretation misconstrues the Court's analysis.

In *Forman*, the issue was whether stock in a state-subsidized cooperative apartment constituted a security. The Second Circuit held that the co-op stock was a security on two alternate grounds. 500 F.2d 1246 (2d Cir. 1974). First, it held that the shares fell within the literal meaning of the definitional section since they were denominated "stock." Second, it held that the shares constituted an "investment contract" within the meaning of *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

The Supreme Court rejected both of the Second Circuit's arguments. First, it held

that the mere fact that shares were denominated "stock" did not make them securities under the Securities Act of 1933. Rather, " 'In searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality.' *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967)." *Forman, supra*, 421 U.S. at 848, 95 S.Ct. at 2058. Nor, said the Court, could the plaintiffs justifiably assume that the securities laws applied merely because these shares were called "stock" since these shares lacked the features commonly associated with stock.

After disposing of the "literalist" argument, the Court disposed of the claim that the co-op shares constituted an investment contract. It stated that the "test for distinguishing [such a] transaction from other commercial dealings is 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' " *Id.* at 852, 95 S.Ct. at 2060 (citing *Howey, supra*, 328 U.S. at 301, 66 S.Ct. at 1104). As the plaintiffs had been attracted by the prospect of acquiring housing, not profit, the co-op shares did not constitute securities.

From this summary, it is clear that the *Forman* Court applied a two-part test only in response to the alternate grounds for the Second Circuit's holding. There is nothing in the opinion that suggests such a two-part test is required and that a finding that an instrument possesses the common characteristics of corporate stock forecloses an inquiry into the economic reality of the transaction. On the contrary, the Court stated that the *Howey* economic reality test, "in shorthand form, embodies the essential attributes that run through all the Court's decisions defining a security." *Forman, supra*, 421 U.S. at 852, 95 S.Ct. at 2060.

*Marine Bank v. Weaver*, —— U.S. ——, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), handed down since the district court's opinion here, supports Judge Conner's restrictive interpretation of the scope of the securities

laws. *Weaver* held that a 6-year, $50,000 certificate of deposit issued by the defendant bank did not constitute a "security" notwithstanding the fact it seemed to satisfy the statutory definition of a security. Noting that the "broad statutory definition" is preceded by the qualifying phrase, "unless the context otherwise requires," the Court admonished that "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." *Id.* at ——, 102 S.Ct. at 1223. In finding that the context otherwise required, the Court emphasized that the plaintiff did not need the protections of the federal securities laws "since the holders of bank certificates of deposit are abundantly protected under the federal banking laws," *id.* at ——, 102 S.Ct. at 1225, and because the plaintiff was almost certain to receive payment in full.

The majority concedes that the plaintiffs here do not need the protections of the securities laws. Those laws protect investors by requiring full and accurate disclosure in connection with the purchase or sale of securities, by requiring the issuer periodically to disclose facts about itself, and by providing a broader range of remedies than the common law. Here, the Goldens were in a position to inspect the business before they bought it; they obtained specific warranties and representations regarding the business's tangible and intangible assets; and they obtained "full operational control of the business" from the moment they signed the purchase agreement. Garafalo stepped aside, delivering his resignation and all the corporate books, records, and contracts. Garafalo's obligation to work as a consultant for a year specifically was as an "independent contractor" with no powers over the business's practices or policies. In short, the Goldens were in a "position to protect their investment," Hannan & Thomas, *The Importance of Economic Reality and Risk in Defining Federal Securities*, 25 Hastings L.J. 219, 249 (1974), quite unlike the investor who places his money in the hands of others or purchases shares on an open market where he cannot obtain firsthand information about the enterprise.

Ultimately, the reason the majority extends the coverage of the securities laws to these plaintiffs is to avoid "the danger of allowing the application of the '33 and '34 Acts to turn on uncertain and slippery factors, case by case." I believe the majority's fears are unfounded. None of the courts that have found the sale of a business not to be the sale of a security have experienced unusual difficulties in reaching that conclusion. Most have faced facts similar to those here, where plaintiffs bought a business that they clearly intended to manage. *E.g., King v. Winkler*, 673 F.2d 342 (11th Cir. 1982); *Canfield v. Rapp & Son*, 654 F.2d 459 (7th Cir. 1981); *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir.), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *Chandler v. Kew*, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,966 (10th Cir. 1977); *Seagrave Corp. v. Vista Resources, Inc.*, 534 F.Supp. 378 [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,469 (S.D.N.Y.1982); *Reprosystem, B. V. v. SCM Corp.*, 522 F.Supp. 1257 (S.D.N.Y.1981); *Zilker v. Klein*, 510 F.Supp. 1070 (N.D.Ill.1981); *Anchor Darling Indus. v. Suozzo*, 510 F.Supp. 659 (E.D.Pa.1981); *Dueker v. Turner*, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,386 (N.D.Ga.1979). The majority apparently fears the extension of these cases to ones where the purchaser acquires, or the seller sells, less than the whole business or less than absolute control. Indeed, some commentators have urged just that, *e.g.*, Seldin, *When Stock is Not a Security: The "Sale of Business" Doctrine Under the Federal Securities Laws*, 37 Bus.Law 637 (1982); Thompson, *The Shrinking Definition of a Security: Why Purchasing All of a Company's Stock is Not a Federal Securities Transaction*, 57 N.Y.U.L.Rev. —— (May 1982) (forthcoming), and one court has even found the purchase of 50% of a company's stock not to be the purchase of a security, *Oakhill Cemetery, Inc. v. Tri-State Bank*, 513 F.Supp. 885 (N.D.Ill.1981). Although the majority implies that the uncertain contours of the "sale of business" doctrine may interfere with business planning, doubts as to the coverage of the antifraud

provisions of the securities laws are unlikely to impede otherwise profitable transactions by persons able to protect themselves by contract. People who can protect themselves by contract will do so whether or not the securities laws apply. However, we need not decide that question today. I would hold simply that the purchase of 100% of the stock of a business that the purchaser intends to operate and control does not constitute the purchase of a "security" under the federal securities laws. Consequently, I would affirm the judgment of the district court.